In the Interest of H.J.P. and
C.E.P., Minors.

James D. HUTCHINSON, Juvenile
Officer, Petitioner-Respondent,

v.

C.A.P., Natural Mother-Appellant.

No. 13065.

Missouri Court of Appeals,
Southern District,
Division One.

April 4, 1984.

Motion for Rehearing or to Transfer to
Supreme Court Denied April 20, 1984.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for petitioner-respondent.

Linda K. Thomas, Thomas & Brown, Springfield, for natural mother-appellant.

TITUS, Judge.

This is an appeal from an order terminating parental rights pursuant to Ch. 211, RSMo 1978. The proceedings below were initiated by a petition in which the juvenile officer of Greene County sought to terminate appellant's rights to her two children, a son C.E., age 7 at the time of the termination hearing, and a daughter, H.J., age 9 at that time. Following a hearing on the petition, the juvenile court entered its order terminating appellant's parental rights. Inasmuch as appellant now claims, inter alia, that there was not clear, cogent and convincing evidence to support certain of the juvenile court's determinations, we find

it necessary to undertake rather extensive recitation of the evidence presented at trial.

### FACTS

Called first to testify on behalf of respondent juvenile officer was Maria Mendez, a psychiatrist requested by the Division of Family Services ("DFS") to do a mental evaluation of appellant. Dr. Mendez saw appellant several times from late April, 1980, until sometime in November of that year. In addition to making clinical observations, she administered a number of tests to appellant in order to ascertain the origin and nature of her mental condition at the time. The resulting diagnosis was that appellant was afflicted with both mental retardation [1] and psychotic decompensation, the latter a condition involving distortions in perception. Because Dr. Mendez's diagnosis included both of these analytically distinct infirmities she could not say with certainty whether appellant's overall condition could be treated or was irreversible, though she was able to characterize the mental retardation as, "in all probability, a permanent state." Dr. Mendez further related that, given appellant's condition of psychotic decompensation, exposure to stress could "very well" plunge her into a psychotic state but that such an eventuality might be avoided if stress were minimized, such as through the sort of environmental control available in a supervised sheltered workshop. However, Dr. Mendez cautioned that placement of appellant in such a milieu would not necessarily bring about improvement in her social adaptive skills.

Dr. Mendez also noted the existence of a "great dependency relationship" between appellant and her mother. The latter lived with appellant, saw to it that the household bills were paid, and, to some indeterminate extent, acted as mother to appellant's two children. Asked if appellant would be able to function and live alone without help or without her mother, Dr. Mendez stated, "at the time that I saw her, I would seriously doubt it."

Appellant was further described as not possessing much practical intelligence. She was oriented to the day of the week but not to the month or year; she could not read and could barely count, though she could identify some letters of the alphabet. She had "no sense of money," e.g., she could not figure change, and, according to Dr. Mendez, would be very handicapped in dealing with ordinary, everyday matters such as what her income and expenses were and how to establish expenditure priorities. Aside from her educational deficiencies, appellant was said to have "poor judgment," a circumstance Dr. Mendez felt would, to some extent, adversely affect her care of the children: "There would be times when she probably would do well by them, but there will be times, too, that she won't." Appellant was said to exhibit concern and affection for her children, her apparent marginal capacity as a custodial parent notwithstanding.

Dr. Mendez had but limited contact with the children, having visited with each for only about an hour and a half. She described H.J. as "rather retarded developmentally, although she struck me as a very bright kid with a lot of potential to learn and make use of new information." Despite appearing "very interested, very willing to learn," at age 7 she barely knew the alphabet. C.E. was said to be "lagging behind" the norm for a 4½ year old but nevertheless seemed "really bright ... with a lot of potential like his sister." He was said to have suffered from "a lot of neurotic fears, night terrors and nightmares." Dr. Mendez was of the opinion that living with appellant "would have a retarding effect" on the intellectual development of the children. More generally and by way of conclusion as to whether appellant should be permitted further contact with her children short of full custody, Dr. Mendez stated, "I think it would be, at best, very disruptive to whatever they're trying to do with their [adoptive] parents and I think it (sic) would be more turmoil

---

1. Appellant's I.Q. was placed at between 30 and 40, a level indicative of moderate mental retardation, and her developmental age at between six and seven years.

both ways, especially to [appellant]." She went on to suggest that contact between appellant and her children every three or four months "would be okay ... as long as [the children's] expectations are not blown out of proportion and the kids know what's going on.... [I]t might be turned into something very productive."

With respect specifically to Ch. 211 grounds for termination, Dr. Mendez testified that appellant's condition would interfere with her ability to provide care and protection to minor children and that her mental deficiency rendered her unable consistently to form an intent or act knowingly. The prognosis allowed for limited chance of improvement.

James Bright, also a psychiatrist, testified that from July 30, 1980, until June 23, 1981, he evaluated H.J. and C.E. to determine whether they were having any problems while in foster care. C.E., who was between four and five years old at the time, was said to have been experiencing frequent nightmares, though he appeared happy during the daytime. He also appeared to be a bit behind in physical development, as he exhibited some problems walking, running, and handling objects, such as a ball.

Dr. Bright described H.J. as "considerably unresponsive, very withdrawn, aloof, shy and at times ... despondent and sad." She had experienced a number of nightmares and was worried obsessively about her mother. This latter preoccupation consisted of her desire that her mother be cared for and her apprehension that her mother would be angry at her for "going away and not taking care of her." H.J. talked at length about how concerned she was for her mother's well-being and said she felt she was not doing enough to care for her. Dr. Bright stated that this concern for her mother's welfare was not normal for a girl H.J.'s age. He found it significant that H.J. appeared to regard it as "her duty" essentially to be "the mother of her mother." Though H.J. demonstrated "considerable intelligence," she seemed very pensive, very worried. That her

movements and speech were slow indicated possible psycho-motor retardation. Dr. Bright detected no gross cognitive or perceptual impairments other than a "relative absence" of knowledge of rather simple things such as shopping centers, grocery stores, theaters—things about which most 7–8 year old children would be fairly knowledgeable.

Dr. Bright testified that the problems exhibited by the children seemed to improve the longer they were away from their mother, e.g., they became more aware of things with which children their ages are commonly familiar. He described their lives in appellant's custody as marked by cultural deprivation; "they have been essentially cloistered in a trailer and watching television."

Asked whether, if appellant's parental rights were terminated, it would be harmful for the children to have occasional contact with appellant Dr. Bright responded he did not "have any reason to think that it would be terribly detrimental to them to occasionally see their mother in some sort of situation. Exactly what that situation would be ... would depend on how the children are functioning."

Betty Weber, a clinical psychologist who evaluated appellant on August 24, 1981, stated that the intellectual, projective, and perceptual-visual-motor testing she did of appellant showed her to be in the range of mild mental retardation. Ms. Weber said this retardation "would interfere with her performing average functions" as well as her ability to form an intent or act knowingly in certain circumstances. She opined that this interference could possibly extend to appellant's performance of maternal duties. Ms. Weber stated that appellant's judgment and reasoning ability could be considered more or less permanently impaired but that improvement would be possible through "adequate habilitative programming," including close supervision and guidance. Such a regime, necessarily comprehensive, would have to be directed toward development of general independent

functioning ability encompassing vocational and "basic survival skills." [2]

Dr. Han Hulstra, a psychiatrist, evaluated appellant in 1966 for the Department of Public Health and Welfare. He testified that, based on the results of tests he administered to her at the time, he diagnosed appellant as then having a severe mental deficiency; her I.Q. score of 36 reflected a mental age of just over six years. At the time, he believed her to be so mentally deficient as to be unable to form an intent or act knowingly. The prognosis was that her condition was permanent and irreversible. Dr. Hulstra had not seen appellant since he evaluated her in 1966.

Charlotte Thomas, a special education teacher and caseworker for mentally retarded persons, conducted an educational evaluation of appellant on August 24, 1981. In reading and math skills appellant tested at the level of a five-year-old. Her performance on a "Street Survival Skills Test" measuring health and safety skills indicated she needed to be in a supervised living arrangement. She was unable to measure ingredients for cooking, set a stove or oven on a specified temperature, read directions on a medicine bottle, locate a number in the telephone directory, or address an envelope. She did not realize that someone with a temperature of 104 degrees should be taken to a doctor or that electrical appliances can be dangerous if left near water. Ms. Thomas testified that appellant's mental deficiency would very probably make her unable to form an intent or act knowingly. She stated that appellant's skills in the above-mentioned areas might possibly improve were she to become involved in a comprehensive program of adult basic education classes, a sheltered workshop employment situation, and supervised living. Ms. Thomas termed it "doubtful" whether appellant would ever improve to as high an educational level as fifth grade.

Ann Dix, a public health nurse at the Springfield-Greene County Public Health Center, came into contact with appellant in a series of home visits from March through November of 1980. The gist of Ms. Dix's testimony was that, over the course of her involvement with appellant's case, the health and sanitary conditions in appellant's home left much to be desired. Though some improvements were made per admonition of various public health nurses, the home remained unsuitable as a haven for children. Ms. Dix, e.g., noted the presence of a foul odor in the home every time she visited. Most significantly, C.E. was on one occasion noted to have "crusty drainage" around his ear, apparently indicating some sort of ear problem. Though one of the nurses then advised appellant to take him to a doctor, appellant made no effort to do so until four days later. Ms. Dix stated, in sum, that appellant had made no really significant efforts to provide for the needs of her children or to prepare for their return to her custody. She speculated that the improvements that did appear may have been the result of there being fewer people in the home.

Jeannie Cummins, a social service worker with DFS until July, 1982, became involved with appellant's case on April 7, 1980, when she responded to a request from the local sheriff's office to visit appellant's home to check into the welfare of H.J. and C.E. Suspicion had been aroused by numerous calls from the home to both DFS and the sheriff's office, relating a variety of bizarre, supernatural occurrences. When Ms. Cummins went to the home she found no evidence that any of the phenomena described had actually taken place. She found the home to be "very dirty and filthy" and so filled with debris that "we could barely get down the hall to the bathroom." Once there she found it "in poor sanitary condition, ... not a healthy place for the children to be at all." She said she noticed "a very strong malodorous condition throughout the entire trailer." There

2. Ms. Weber noted that appellant did not know her own age, her birthdate, or her address; that she could not identify most of the basic colors; and that she could not tell time. Her memory, both recent and remote, was shown by tests to be impaired.

was "more or less rancid" old food lying on the kitchen table. As for the children, Ms. Cummins found them "dirty and unkept (sic), in need of baths" and grooming. Though it was early April, C.E. was not wearing shoes. After Ms. Cummins explained to appellant that the children were in need of protection and that DFS could provide such protection, appellant and her mother agreed to the removal of the children from the home. They were placed in foster care the same day.

Subsequently Ms. Cummins made regular contacts with appellant, most often during the latter's weekly visits with her children. The behavior of the children on these occasions led Ms. Cummins to regard them as more or less indifferent to separation from their mother; they appeared neither extremely anxious nor reluctant to see her, though they were a bit hesitant to go to the visiting room and were somewhat relieved when a visit ended. These observations notwithstanding, parts of some of the visits were described by Ms. Cummins as "delightful." Appellant consistently demonstrated affection and concern for her children, such as by bringing them small gifts.

Ms. Cummins also regularly contacted appellant at the latter's home, once a week for the first 60 days following removal of the children and monthly thereafter. The condition of the home remained "essentially the same" throughout the period during which these visits were made. Though the trailer appeared less cluttered than it had been in April of 1980, according to Ms. Cummins it was at no time as clean as it should have been for young children.

Ms. Cummins also testified concerning the efforts made by herself and DFS on appellant's behalf. For her own part, Ms. Cummins was involved in setting up plans to enable appellant to improve upon the conditions responsible for the placement of her children in foster care. She referred appellant to several agencies [3] and assisted her in contacting them. During the initial 60 days of her involvement with appellant Ms. Cummins provided for nearly all of appellant's transportation to and from appointments with agencies and visits with her children. She stated that appellant did not independently cooperate with the various agencies, that others had to see that she got in touch with them. Ms. Cummins frequently drove appellant to Dr. Mendez's office and tried to work with her concerning the taking of her prescribed medicine. Ms. Cummins also tried to act as liaison between appellant and the Health Department concerning the improvement of health and sanitary conditions in the home, though she received little cooperation from appellant in this regard. Further, Ms. Cummins arranged for a volunteer from DFS to give appellant individual instruction on matters of nutrition, hygiene, grooming, and the basic needs of herself and her children. In sum, Ms. Cummins stated that DFS used its best efforts to aid appellant in rectifying the conditions which led to the removal of her children, that "we used all the available resources ... in the community" in doing so.

As mentioned supra, Ms. Cummins was involved in setting up the court-approved plans designed to help appellant improve her situation. These plans, three in all, were described as "specially tailored" to the needs of appellant, i.e., devised with her mental and educational deficiencies in mind. Ms. Cummins stated she read the plans to appellant and discussed them with her "item by item." A fair amount of testimony was adduced concerning whether or not appellant complied with the provisions of the plans, the essence of which was that she either did not or did but only through the efforts of others. One provision, for instance, mandated cooperation with the Health Department in improving health and safety conditions in the home, yet throughout the successive periods in which the plans were in effect, conditions in the home remained substantially unremedied. Ms. Cummins stated appellant did

---

**3.** These included a local sheltered workshop, the Missouri Division of Aging, the Department of Mental Health, and the Springfield Regional Center for the Developmentally Disabled.

not at any time provide a clean, safe, properly heated and furnished home for the children, that conditions never improved sufficiently for their return. Other plan provisions required appellant to see Dr. Mendez and to continue monthly visits with her children. Appellant complied with these requirements but only with the help of others such as Ms. Cummins and, later, relatives in Kansas.

On the basis of what she regarded as appellant's noncompliance with the various plans, Ms. Cummins opined that she would be unable to form an intent or act knowingly in attempting to discharge the duties of a parent or consistently to provide necessary care and protection for her children. Ms. Cummins was of the view that "literally none of the conditions which led to the children being taken away" was ever rectified or would ever be rectified. She stated that by the time appellant had moved to Kansas two plans had been implemented without success and it appeared that improvement of the conditions in question was more or less a lost cause.

Appellant testified on her own behalf concerning, inter alia, her current situation. She stated she moved from Springfield, Missouri, to Wichita, Kansas, in the fall of 1981 so she "could get help" and subsequently began working at the Elks' Training Center, a sheltered workshop in Wichita. She still worked there as of the trial date. She gets to the center via bus, works from 9:00 to 4:00 in the electronics division, and is paid $2.00 a hour. She stated she has not missed any days of work during her tenure at the center and has received no complaints about her job performance. She said she enjoys her work and that through it and the classes she attends at the center she is learning to help herself, learning skills that would help her get a job in a factory or business. As of trial appellant was living in what she referred to as a "co-op home" with three other women and a housemother.

On cross-examination by the guardian ad litem of H.J. and C.E., appellant responded to numerous questions designed to probe the extent of her intelligence. She incorrectly stated her age; did not know the year of her birth or when her children were born; did not know the capitals of Missouri, Kansas, or the United States; did not know what month it was at the time; did not know her mailing address. She could neither add nor spell and had not attended school beyond the third grade.

Magnolia Carter, presumably a friend of appellant, testified that appellant had been good to H.J. and C.E. and that they seemed happy around her. She stated appellant could cook, sew, and keep house and that she tried to be a good mother.

## DISCUSSION

■ The standard of review in a court-tried case where the rights of a parent have been terminated is upon both the evidence and the law as in suits of an equitable nature. Due regard is given for the opportunity of the trial court to judge the credibility of the witnesses and the decree will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *In Interest of D.A.F.*, 637 S.W.2d 780, 782[1] (Mo.App.1982); *In Interest of M____ K____ P____*, 616 S.W.2d 72, 80 (Mo.App.1981).

Appellant in her first point assigns as error the juvenile court's mistaken references to statutory authority in its conclusions of law. Inspection of these conclusions reveals that some are followed by citations to particular sections of Chapter 211; in four of eight instances the citations are to provisions other than those pursuant to which the respective conclusions were made. E.g., Conclusion No. 2 is followed by "Section 211.442(2)(b)" rather than 211.447.2(2)(b).

■ Appellant refers us to the oft-recited observation that proceedings involving termination of parental rights are of the utmost gravity in that they contemplate a complete and final severance of all legal rights, privileges, duties and obligations be-

tween parent and child, with the prospective replacement of the natural by an adoptive parent or perhaps a guardian, *D_____ J_____ A_____ v. Smith,* 477 S.W.2d 718, 720 (Mo.App.1972), as well as to the well-settled proposition that inasmuch as the power given the juvenile court to terminate parental rights is wholly a creature of the legislature, it is imperative that the terms of the pertinent statute be strictly applied. *D.E.J. v. G.H.B.,* 609 S.W.2d 472, 474[1] (Mo.App.1980); *S.K.L. v. Smith,* 480 S.W.2d 119, 123[5] (Mo.App.1972).

■ The provision appellant seeks to have "strictly applied" is § 211.482, which specifies that "An order of the court terminating parental rights shall be in writing and shall recite the jurisdictional facts, a factual finding of one or more of the conditions set out in section 211.447, and that the best interest of the child is served by terminating all parental rights of the parent." The order of the court below fully complied with these requirements. Even a cursory reading of § 211.482 would suffice to convince us that it was not necessary that the required findings and conclusions be accompanied with references to the authority by which those findings and conclusions were made. As respondent correctly asserts, the recitation in the court's order of the statutory bases for its decision is superfluous. *Casper v. Lee,* 362 Mo. 927, 944, 245 S.W.2d 132, 141[25] (banc 1952); 49 C.J.S. Judgments § 71, at p. 189. Appellant's first point is denied.

■ In her second point appellant contends the juvenile court erred in terminating her parental rights in that the written report which § 211.472 requires the juvenile officer to make in all involuntary termination proceedings either was not made or was made but was not made available to appellant prior to trial. Whether or not either of these alternative contentions has merit is of no moment as appellant, having omitted to make objection at trial concerning either ground of error, has failed properly to preserve them for our consideration. *In re Marriage of Ryterski,* 655 S.W.2d 102, 103[1] (Mo.App.1983); *In re Marriage*

*of Kuhl,* 640 S.W.2d 828, 830 (Mo.App. 1982); *Niederkorn v. Niederkorn,* 616 S.W.2d 529, 535[10] (Mo.App.1981). Further, we decline to undertake plain error review of this point as requested by appellant. The plain error rule may be resorted to only in the exceptional case where the reviewing court deems that manifest injustice has occurred. *Cowden v. Sun Oil Company of Pennsylvania,* 583 S.W.2d 547, 549–550[6] (Mo.App.1979); *Birmingham v. Coen,* 320 S.W.2d 509, 510[2] (Mo. 1959). It may not be invoked to excuse mere failure to timely and properly object. *Brown v. Boyd,* 422 S.W.2d 639, 643[5] (Mo.1968).

■ Appellant's third point is that the juvenile court's finding that termination would be in the best interest of the children is not supported by clear, cogent and convincing evidence as required by § 211.447.-2. Section 211.447.2 provides: "The juvenile court may, upon a petition filed by the juvenile officer under this section, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child" *and* that one or more of certain enumerated conditions exists. While it is thus clear that a termination order must be grounded upon two technically distinct determinations—one, that termination is in the best interest of the child and two, that one or more of the specified grounds exists—it should be equally clear that these determinations cannot as a practical matter be based upon wholly separate considerations. Indeed, it is difficult to imagine a need for judicial inquiry into a child's best interest apart from consideration of such particular circumstances as would give rise in the first instance to some question whether that interest would be served by termination. The question may thus be framed: Assuming one of the particular grounds is found to exist, is termination yet in the child's best interest? For it is clear that, absent such particular ground, there can be no termination and, further, as mentioned supra, that the "best interest" inquiry is possible only to the

extent particular circumstances make it necessary.

■ The thrust of the foregoing discussion is that evidence relevant to one of the particular grounds is necessarily relevant, albeit indirectly, to whether or not termination is in the best interest of the child. Thus when appellant in her third point complains of a dearth of evidence to support a finding that termination is in the best interest of her children, she improperly restricts her purview to that evidence which relates *in terms* to the "best interest" issue and therefore fails to consider the implications for that issue arising out of the conditions of which there is extensive evidence.

The court in *J.H.H. v. J.D.*, 662 S.W.2d 893, 897 (Mo.App.1983), faced with a "best interest" contention like that herein, stated,

> While we acknowledge 'the best interest of the child' to be among those 'imprecise substantive standards that leave determinations unusually open to the subjective values of the judge,' *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982), in the context of termination of parental rights proceedings it connotes the *parens patriae* interest in providing the child with a permanent home. Id. 102 S.Ct. at 1401. It includes the child's need for a 'home in which the child will be housed, fed, clothed and educated, at least according to acceptable community standards.' *In re C_____,* 468 S.W.2d 689 (Mo.App.1971).

■ In view especially of the testimony of Dr. Bright, the psychiatrist who evaluated H.J. and C.E. from July, 1980, until June, 1981, and of Ms. Cummins and Ms. Dix, both of whom related their observations of the substandard conditions in appellant's home, we cannot but believe that the juvenile court was correct in concluding that the best interest of the children would be served by termination. Appellant's third point is therefore denied.

■ Appellant next contends the juvenile court erred in admitting in evidence as juvenile officer's Exhibit H the "Narrative Report Section" of the DFS file on appellant in that this set of documents constituted hearsay not within the exception afforded by § 490.680, RSMo 1978, the Uniform Business Records as Evidence Law. We note initially that in a court-tried case such as this it is well-nigh impossible to predicate reversal on the erroneous admission of evidence. The party advancing the contention must demonstrate the absence of sufficient competent evidence to support the trial court's decree. *N.K.M. v. L.E.M.*, 606 S.W.2d 179, 187[13 and 18] (Mo.App.1980); *In re Adoption of S.*, 581 S.W.2d 113, 118[5, 6] (Mo.App.1979); and numerous cases collected in Missouri Digest 2d, Appeal and Error Key No. 1054(1).

■ Nevertheless, we consider appellant's evidentiary point on its merits, if any. Appellant asserts that juvenile officer's Exhibit H was not properly qualified as a business record in that 1) no testimony was adduced regarding its mode of preparation; 2) the witness through whom it was offered in evidence was not a "custodian" of such records within the meaning of § 490.680; and 3) it was not so marked as to be distinctly identifiable from among other DFS documents related to appellant's case. First, while appellant is correct in asserting there was no testimony as to the mode of preparation of Exhibit H, admission of that set of documents was harmless in that there was substantial competent evidence exclusive of it to support the juvenile court's order. *N.K.M. v. L.E.M.*, supra at 187[17, 18]; *In re Adoption of K*, 417 S.W.2d 702, 708[10] (Mo.App.1967). Second, § 490.680 permits introduction of business records through their "custodian *or other qualified witness.*" (Emphasis ours.) Exhibit H was identified and presented by Mr. James Hawkins, a DFS employee with responsibility for appellant's case. As the professional responsible for handling the case, Mr. Hawkins was, to our minds, a "qualified witness;" it is immaterial, given the disjunctive wording of the statute, that he was not formally cloaked with the mantle of "custodian." Finally, appellant made no objection at trial to Exhibit H on the ground that it was improper-

ly marked. She may not alter or broaden the scope of her objections on appeal. *Tomlinson v. O'Briant,* 634 S.W.2d 546, 548[1] (Mo.App.1982); *Cowden* at 549[5]. Appellant's fourth point is denied.

■ We now consider appellant's points relative to the juvenile court's findings of certain of the particular grounds for termination set out in § 211.447.2(2). Should in our opinion any one of these findings prove impregnable as against appellant's respective attack, it will be unnecessary for us to pass upon the correctness vel non of the others, as the existence of but one of the statutory grounds is a sufficient condition for termination, provided, of course, termination is in the best interest of the children.

■ Appellant challenges the juvenile court's finding that she has a mental condition of a kind and to a degree sufficient to form a basis for termination of her parental rights; specifically, she contends that this finding is not supported by clear, cogent and convincing evidence.

The standard for termination of parental rights on the basis of mental deficiency is set forth in § 211.447.2(2)(g):

The parent has a mental condition which:

a. Renders him unable to form an intent or act knowingly; and

b. Is shown by competent evidence to be permanent or that there is no reasonable likelihood that the condition is reversible, and such parent has substantially and repeatedly neglected the child or failed to give the child necessary care and protection.

As respondent correctly points out, there was ample testimony that appellant has a mental condition which renders her unable to form an intent or act knowingly. Both psychiatrists who testified on this issue, Dr. Mendez and Dr. Hulstra, proffered that conclusion in as many words. Echoing this assessment were Ms. Thomas, the special education teacher who performed an educational evaluation of appellant, and Ms. Cummins, appellant's DFS caseworker. We emphasize that these apparently rote recitals are supported by the plentiful evidence, summarized supra, concerning appellant's particular mental and educational deficiencies.

Subparagraph b of § 211.447.2(2)(g) requires first a showing that the parent's mental condition is permanent or that there is no reasonable likelihood that such condition is reversible. Appellant argues that hers is not an "utterly hopeless situation ... in that with adequate habilitative programming, supervision, guidance, and somebody to work with her, improvements could be made." Dr. Mendez, however, was not so optimistic, opining that appellant could reasonably expect only limited improvement. Dr. Hulstra, who evaluated appellant in 1966, testified he then diagnosed her as having a "severe mental deficiency" that was permanent and irreversible. Lest one doubt the relevance of an evaluation conducted some 16 years prior to the termination hearing, we note that appellant's I.Q./developmental age proved to be the same in 1980 when Dr. Mendez evaluated her. In our view, this apparent stagnation is a most telling testament to the permanence of appellant's condition.

We acknowledge that there is evidence in the record to the effect that, through comprehensive therapy and omnipresent supervision, appellant could achieve some improvement in her situation. But considering the totality of the evidence we are of the opinion that such improvement would amount to merely an enhancement of appellant's ability to cope with what the record indicates is an essentially irremediable condition. Inasmuch as the pertinent portion of § 211.447.2(2)(g) b. requires only a showing that the parent's condition is permanent, we deem it immaterial to the instant proceeding that appellant has the potential to cope, even optimally, with her permanent mental deficiency.

The final requirement for termination pursuant to § 211.447.2(2)(g) is a showing that the parent "has substantially and repeatedly neglected the child or failed to give the child necessary care and protection." The court in *In Interest of Baby Girl D.,* 651 S.W.2d 195, 198[2] (Mo.App.

1983), emphasized that this element is in the disjunctive; it requires a finding that the parent has *either* substantially or repeatedly neglected the child *or* failed to give the child necessary care and protection. Thus, while the juvenile court herein concluded that both of these circumstances existed, we need consider only whether there is clear, cogent and convincing evidence to support a finding of either.

Perusal of the foregoing fact recitation should make it abundantly clear that appellant has failed, albeit because of factors largely beyond her control, to give her children necessary care and protection. We therefore need allude only to a few select particulars at this juncture. Ms. Dix, testifying anent conditions in appellant's home, stated they were "not conducive to the proper health and care of the children" and that, although some improvements were made throughout the period of her visitation, these could be attributed to the presence of fewer people in the home and, in any event, were not appreciable. Ms. Cummins testified likewise, stating that the condition of the home remained "essentially the same" throughout her involvement with appellant's case and that, while the home became less cluttered than it had been in April, 1980, at no time was it as clean as it should have been for young children.

There is also the matter of C.E.'s ear condition, observed by the public health nurses who visited the home in March, 1980, as well as the dirty, unkempt appearance of both children, noted by Ms. Cummins and Ms. Dix during their respective visits to appellant's home. Discussing the significance of "isolated instances" of parental dereliction, the court in *Baby Girl D.*, supra at 198, observed that "there is no requirement that [the] failure [to provide necessary care and protection] be continuous or repeated, in that necessary care and protection contemplates more serious acts than neglect, and could involve life-threatening situations." The court, in dealing with the particular facts of the case before it, conceded that "these failures on the part of [the mother] were observed only over the course of a few days, and were relatively narrow in scope," but nevertheless concluded that "when the potential seriousness of these failures is considered in light of [the mother's] mental disorders as assessed by the two psychiatrists, it is apparent to this court that [she] failed to give her baby necessary care and protection." Id. at 199. We think this insight applies with equal force to the facts of the instant case. Children should not have to sacrifice their well-being in order that too great an obeisance be done to a standard of proof.

The order of the juvenile court terminating appellant's parental rights is affirmed.

GREENE, C.J., and CROW, J., concur.

FLANIGAN, P.J., not sitting.