In the Interest of S.P.W., K.L.W. and C.A.W., Guardian ad Litem.

JUVENILE OFFICER, Plaintiff/Respondent,

v.

D.W. (Natural Mother), Defendant/Appellant.

No. WD 40151.

Missouri Court of Appeals, Western District.

Oct. 4, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 29, 1988.

Clyde W. Curtis, William S. Ohlemeyer, Kansas City, for defendant/appellant.

William R. Jackson, Kansas City, for plaintiff/respondent.

Before CLARK, P.J., and LOWENSTEIN and FENNER, JJ.

FENNER, Judge.

D.W., the natural mother herein, appeals from an Order and Judgment terminating parental rights as to her three children, S.P.W., K.L.W. and C.A.W. In her sole point on appeal, she complains that the trial court erred by failing to consider her ability to care for one or more of her children individually and found improperly that her mental condition prevented her from caring for all three children.

It is worthy to note that this is the second time D.W. has been before this court appealing from a judgment terminating her parental rights. In the case of *In Re S.P.W.*, 707 S.W.2d 814 (Mo.App.1986), this court reversed the judgment of the trial court terminating D.W.'s parental rights to her three children. One of the grounds for reversal therein, and the only one pertinent to the present appeal, was that the juvenile officer had presented evidence solely from non-medical witnesses and had failed to adduce the available psychiatric evidence concerning D.W.'s mental condition including its permanency and effect. *Id.* at 823, 824.

The three male children of D.W. have essentially all been raised since birth in the Division of Family Services (hereinafter DFS) foster care program.

At trial evidence was presented by the juvenile officer in the form of testimony from social workers, medical doctors and psychologists concerning the physical condition of the three children as well as D.W.'s mental well-being, ability to care for herself and others and her prospects for improvement. This testimony was based on examinations of the children, social service workers' contacts with D.W. and examinations of D.W. by several doctors and psychologists.

The eldest child, S.P.W., was born October 31, 1978. Pursuant to an amended petition filed under § 211.031 RSMo, 1978, S.P.W. was taken under the jurisdiction of the juvenile court on November 13, 1978. The allegations of that petition were sustained and the child was committed to the DFS for placement in foster care. The child has continuously remained committed to the custody of the DFS for placement in foster care since that time. At the time of trial S.P.W. was nearly ten years of age. He has been in foster care since he was three months old. S.P.W. is insecure, has inner conflicts regarding how to respond to adults and has issues to resolve regarding relating to his peers. S.P.W. is also allergic to certain foods and his diet requires close monitoring.

K.L.W. was born on October 15, 1979. He was taken under the jurisdiction of the juvenile court on July 15, 1980, pursuant to a second amended petition filed under § 211.031 RSMo, 1978, on May 20, 1980. Following a hearing on July 15, 1980, the juvenile court sustained the petition and committed K.L.W. to the DFS for placement in foster care. K.L.W. was detained in foster care on December 4, 1979, and has remained continuously in foster care since that time. K.L.W. has been in foster care since infancy. Numerous health problems plague K.L.W. including weak mouth muscles which cause him to drool frequently, droopy eyelids which have been partially corrected by surgery and he suffers frequently from colds, influenza and strep throat. During the first few months of his life, he suffered from seizures for which medication was prescribed. Although K.L.W. was recently removed from his medications his condition requires close monitoring for any recurrence.

C.A.W. was born May 11, 1981. On October 15, 1981, he was taken under the jurisdiction of the juvenile court pursuant to a first amended petition filed on May 20, 1981, under § 211.031 RSMo, 1978. On that same day, following a hearing, the juvenile court sustained the petition and C.A.W. was committed to the custody of DFS for placement in foster care. C.A.W.

has remained continuously in foster care since being detained on May 21, 1981. C.A.W. suffers from asthma and frequently has respiratory infections. He was born with a shallow chest cavity with a depression in the center, which may require surgery but which for now necessitates frequent medical monitoring. Presently, C.A.W. requires specialized classes to work on delays that he suffers in receptive and expressive language skills, fine motor skills and behavior skills.

A wealth of testimony concerning the parenting history of D.W. was adduced at trial.

Karen Levy, a social worker with the Missouri DFS was assigned to work with D.W. from approximately September, 1979, around the time that D.W. gave birth to her second son, K.L.W., until March, 1986. D.W. was legally incompetent at the time Levy began working with her. At this time D.W.'s first son had been in foster care for eleven months because D.W. was unable to provide him with appropriate care and supervision. Levy identified a number of deficits on D.W.'s behalf that Levy opined would need to be addressed before D.W. would be able to assume custody of her children, namely that D.W. displayed no understanding of normal child care and development and failed to demonstrate the basic skills required in maintaining a household, i.e., housekeeping and budgeting. Additionally, Levy observed that D.W. lacked self-esteem, had no self control, was unable to work with authority figures, was unable to follow a schedule, was unable to get along with her neighbors, had no support system, was unable to accept constructive criticism and had made suicide threats and attempts.

Levy arranged for D.W. and her son K.L.W., three days old at the time, to stay in the Parent Care Unit at Children's Mercy Hospital in an effort to provide D.W. with "hands on" parenting training in a supervised setting. Following an eleven day stay, D.W. exhibited little, if any, improvement in her parenting skills and was referred next by Levy to the Blosser home where D.W. and K.L.W. were enrolled in a more intensive parenting program. While at the Blosser home, D.W. and K.L.W. were observed by a medical consultant, Dr. Michael Butner. Dr. Butner testified that he diagnosed K.L.W. with a non-organic failure to thrive secondary to emotional and physical deprivation and recommended hospitalization. During the time K.L.W. was hospitalized for this condition, D.W. was reluctant to hold him and usually kept him at arms length. Additionally, D.W. would not initiate any activity to care for K.L.W. unless stimulated to do so, she was consistently defensive and agitated with K.L.W. and the hospital staff and had outbursts of anger and hostility. D.W. could not follow instructions or repeat demonstrations given by the staff and did not appear to comprehend what had been presented. Following a ten day stay in the hospital K.L.W. was returned to Blosser Home with D.W. Based on his observations of D.W. and K.L.W. during the hospitalization, and one week thereafter, Dr. Butner was of the opinion that D.W. was not able to provide proper care for K.L.W. and K.L.W.'s life would be endangered if left solely in D.W.'s custody. Dr. Butner did not believe that D.W. would ever improve her parenting capabilities. K.L.W. was detained in foster care on December 4, 1979.

Levy next recommended D.W. to Catholic Charities for individual psychotherapy. D.W. attended counseling for about five months, but was not successfully discharged as of March, 1980.

D.W. was then referred to Wayne Miner in May, 1980. Joyce Carter, a social worker experienced with teaching parenting skills to parents with limited mental capabilities, counseled and attempted to instruct D.W. until July, 1982, approximately two years. During this time Carter saw D.W. in twelve parent education group sessions, thirty individual sessions and supervised thirteen visits between D.W. and her sons S.P.W. and K.L.W. Carter testified that she made unsuccessful attempts to teach D.W. nutritional skills, child safety skills, budgeting skills, daily living skills, impulse control, homemaking skills as well as other parenting skills. D.W. was described by

Carter as unable to put into action that which had been presented to her and unaccepting of suggestions or criticism. According to Carter D.W. made no progress in parenting instruction, continued to demonstrate unrealistic expectations of herself, her children and other persons and perceived the normal developmental behavior of her children as deliberate actions taken by the children to thwart her.

A Dr. E.B. Lorenzo completed a full psychiatric evaluation of D.W. in October, 1980. According to Dr. Lorenzo, D.W. was operating within the borderline to dull normal range of intelligence and was found to be exhibiting a low frustration tolerance, frequent outbursts of anger that she had difficulty controlling, anxiety, poor insight to her problems, and poor impulse control. D.W.'s mental disorder was diagnosed as a "personality disorder, explosive personality" and her capabilities of parenting a child were found to be poor. Dr. Lorenzo recommended that Ms. Ward begin medication and become involved in a parent education program, although it was his opinion that the prognosis for improvement in her condition was poor.

C.A.W. was born on May 11, 1981. After C.A.W. was dismissed from the hospital, he and D.W. were admitted to the Parents Care Clinic at Children's Mercy Hospital where they remained for five days but were unsuccessfully discharged. C.A.W. was placed in foster care on May 21, 1981.

Following her unsuccessful stay at Children's Mercy, D.W. was again referred by Ms. Levy in July, 1981, this time to a Sandra Lyke who conducted individual parenting groups at Western Missouri Mental Health Center. Also at this time D.W. was referred by Levy to an individual counseling program and a program dealing with personal issues with Mike Kellerman, a clinical psychologist and outpatient coordinator for Swope Parkway Comprehensive Mental Health Center. Mr. Kellerman's diagnostic impression was that D.W. was suffering from "intermittent explosive disorder". D.W. enrolled in what is called a Partial Hospital Program at the referral of Kellerman. This program was designed to provide instruction to its participants in daily coping techniques and skills required to maintain a household such as cooking and budgeting. D.W. participated for two months but like the many before it, this program was not successfully completed.

In September, 1981, Levy referred D.W. to Family and Children's Services for individual counseling to address personal problems including anger control, her ability to care for herself and parenting issues. This program, as well, was not completed successfully.

In April, 1982, the DFS attempted to locate a foster home that would accept both D.W. and C.A.W. so that D.W. could attempt to be a parent on a 24 hour basis. Levy located a placement which D.W. rejected. Also in April, 1982, DFS and D.W. agreed upon a 90 day reunification plan for D.W. and her children but D.W. failed to accomplish the goals outlined in the plan.

Next, in December, 1982, Levy referred D.W. to Briscoe Carr Consultants where she attended until she terminated this service unsuccessfully in August, 1983.

Apparently, individual counseling and parenting training have continued to be made available to D.W. since 1983 including treatment with two different counselors at Welfare Rights in 1983.

Beginning in June, 1986, D.W. began seeing Dr. David Watkins, and received individual psychotherapy and "hands on" parenting training during visits with her three children. This individual counseling was provided to D.W. in an effort to teach her daily coping skills and to assist her in stabilizing her lifestyle and emotional state. D.W. discontinued this treatment in February, 1987. Dr. Watkins testified that it was his diagnostic impression that D.W. suffers schizophrenia, residual type and that she is borderline or educable mentally handicapped. According to Dr. Watkins D.W.'s condition is a permanent and chronic mental disorder for which there is no known cure and which must be treated with medication. Dr. Watkins stated that the prognosis for D.W. is poor, especially because she has refused to take medication. He also stated that he was never

able to recommend that D.W. have more than one two-hour supervised visit per month with her children. Finally, Dr. Watkins stated that it was his belief that if the children were placed in D.W.'s care and custody they would be at risk of physical abuse and neglect.

In October, 1986, Dr. Curtis Franklin, a psychiatrist affiliated with Swope Parkway Comprehensive and Mental Health Center, completed a psychiatric evaluation of D.W. Dr. Franklin testified that when he interviewed D.W. she displayed concrete thinking, poor judgment, irritability, extremely limited insight and that her conversation was loose and tangential. He was of the opinion that D.W. suffers from mild to moderate mental retardation and schizophrenia, residual type, mental disorders for which there is no recognized cure in the field of psychiatry and for which the ordinarily prescribed treatment is medication and psychotherapy. He was of the opinion that the prognosis for D.W. was poor. Dr. Franklin also stated that D.W. is only marginally capable of caring for herself and would probably never be capable of caring for her children.

Appellant alleges that the trial court erred in terminating her parental rights to her three children because there was a lack of clear, cogent and convincing evidence in the record to support the court's order. Appellant argues that the trial court should have, but failed to, consider her ability to care for one or more of her children individually. She alleges there is no evidence of record to support a finding that she is incapable of providing the necessary care and protection for at least one (or more) of her children. This error is further highlighted, according to appellant, by the court's failure to consider her ability to care for a child of normal intelligence and average health.

The Order and Judgment which terminated appellant's parental rights is based upon § 211.447.2(3)(c) RSMo, 1986, which provides in pertinent part:

2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

The trial court made extensive findings based upon the testimony presented at trial. Following the language of § 211.447.2(3)(c), the trial court found "by clear, cogent and convincing evidence that [D.W.] suffers from a mental condition which renders her unable to knowingly provide any of the three children with the care, custody and control that each of them requires and there is no reasonable likelihood that her condition can be reversed." After a comprehensive review of the evidence the court concluded that:

"[a]ny one of these children would pose an uphill struggle for a parent with normal mental capabilities and parenting knowledge. However, the parent in question in this case is a parent with a profound mental disorder who has been offered every service available to date to assist her in becoming a capable parent

and who yet despite approximately seven years of exhaustive services is barely capable of caring for herself."

■ In termination of parental rights cases the major concern is with the best interest of the child. *In Interest of M.E.W.*, 729 S.W.2d 194, 195 (Mo. banc 1987). Clear, cogent and convincing evidence must establish that the conditions of § 211.447 RSMo, 1986, exist. *Id.* This court should give due regard to the trial court's opportunity to judge the credibility of witnesses and sustain the decree unless there is no substantial evidence to support it, it is contrary to the evidence or it erroneously declares or applies the law. *Id.* at 195, 196, *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985).

■ The best interest of the children in this case dictates that the decision of the trial court must be affirmed. The record is replete with clear, cogent and convincing evidence from which the trial court could conclude that termination would serve and protect the best interest of each of the children. *See, In Interest of J.I.W.*, 695 S.W.2d 513, 517 (Mo.App.1985). Contrary to appellant's contention, the trial court clearly considered her ability to care for one or more of her children individually. A review of the record indicates that, as the trial court found, any one of the children would pose an "uphill struggle" for appellant. As previously recited each of the children has special needs and suffer from either emotional or physical problems or both which require careful monitoring. Furthermore, the record reflects that each of the children has been in foster care since infancy. All three of the boys are very bonded to their current foster parents and regard them as their true parents. The foster parents have provided the children with the care, nurturance and special attention they require and desire to adopt the children.

Likewise there was more than ample clear, cogent and convincing evidence from which the trial court could find that the conditions set forth in § 211.447.2(3)(c) RSMo, 1986 existed. *J.I.W., supra* at 517, (holding sufficient evidence to terminate parental rights based on mothers' mental illness pursuant to the conditions of § 211.447.2(2)(g), RSMo 1982, which was amended in 1986 but remains substantially the same). Clearly the children have been under the jurisdiction of the juvenile court for a period of one year and the conditions which led to that jurisdiction, namely D.W.'s mental condition, continue to persist. There is little likelihood that those conditions will be remedied in the near future, and continuation of the parent-child relationship greatly diminishes any of the children's prospects for early integration into a stable and permanent home. Furthermore, unlike the problem presented in appellant's prior appeal in *S.P.W., supra,* pursuant to § 211.447.2(3)(c), the court herein had sufficient competent medical evidence as to D.W.'s mental condition which was shown to be permanent with no reasonable likelihood of reversal and which renders D.W. incapable of knowingly providing the necessary care, custody and control of any one of her children individually.

The record indicates that the efforts of DFS to attempt to aid appellant in her parenting skills have all been unsuccessful and there is nothing to indicate that further efforts by DFS would improve appellant's skills in this regard. To the contrary, the uncontroverted, competent medical evidence indicates that appellant's prognosis is poor and that her condition is incurable and must be treated by medication which appellant refuses to take. *See, P.A.W. v. A.M.W.*, 716 S.W.2d 284, 289 (Mo.App. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1988).

Appellant's argument that the trial court erred in failing to consider her ability to care for a child of normal intelligence and average health is without merit and irrelevant to the present case because none of appellant's children exhibits these characteristics.

Because there is no firm belief that the judgment of the trial court was wrong, the order terminating appellant's parental rights is affirmed. The cause, however, is remanded to the trial court solely for a determination of appropriate attorney's

fees herein pursuant to § 211.462.4 RSMo, 1986, *See, A.M.G. v. Missouri Division of Family Services,* 660 S.W.2d 370, 371 (Mo. App.1983).

All concur.