In the Interest of BABY GIRL D.,

B.D., Natural Mother of Baby Girl D., Appellant,

v.

Michael W. PRENGER, Respondent.

No. WD 33961.

Missouri Court of Appeals,
Western District.

April 26, 1983.

Willard C. Reine, Jefferson City, for appellant.

Michael W. Prenger, pro se.

Duane E. Schreimann, Jefferson City, Guardian Ad Litem.

Before WASSERSTROM, P.J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

Michael W. Prenger, the juvenile officer of Cole County, filed a petition seeking to terminate the parental rights of B.D. to her daughter, Baby Girl D. The court entered judgment terminating parental rights, and the mother has appealed, contending that the evidence was insufficient to show the existence of any statutory ground for terminating her parental rights. Affirmed.

In December of 1980, B.D. visited a social worker with the Division of Family Services and indicated that she wanted to relinquish for adoption the child which she was about to bear. Thereafter, B.D. entered the hospital and on December 24, 1980, delivered the baby girl who is the subject of this action. The same social worker visited B.D. in the hospital on December 29, 1980, at which time B.D. executed a relinquishment of parental rights. Pursuant to that relinquishment, Baby Girl D. was taken from the hospital by the division and placed in a

foster home. On December 29, 1980, the juvenile officer of Cole County filed a petition requesting that B.D.'s parental rights be terminated. B.D. has been unable to identify the child's father.

When the petition to terminate parental rights was heard in February of 1981, there was evidence from a psychiatrist which revealed that B.D. had been diagnosed as having paranoid schizophrenia. The psychiatrist stated that B.D. had a tendency not to take her medication, and that she had been irregular in keeping her appointments with him. He stated that a good deal of conflict existed between B.D. and her own mother, with whom she lived.

He found B.D. to be of above average intelligence, and explained that while schizophrenia does not affect the intelligence, it does produce fixed delusions. B.D.'s delusions were of a paranoid nature, in that she believed her mother and others were plotting against her. The psychiatrist said that B.D. had consistently denied that she had any illness, had chosen not to take her medication or to follow recommended therapy, and had left the hospital many times while undergoing treatment for her mental condition, stating that she did not need to be hospitalized, when it was obvious that she did.

The psychiatrist further testified that B.D. frequently had suicidal thoughts, and had jumped from the bridge crossing the Missouri River at Jefferson City around January of 1980. On that occasion she had landed on railroad tracks, incurring multiple physical injuries for which she was hospitalized. Subsequent to that hospitalization, B.D. was hospitalized in Fulton for her mental condition. In the opinion of the psychiatrist, if B.D. did not take her medication or otherwise cooperate in her own treatment, she would be unable to care for her child. He believed that the potential of B.D.'s being a danger to her child was very high.

The transcript of the hearing reveals that B.D. frequently interrupted the testimony of other witnesses with incoherent statements. For instance, when the social work-er was testifying regarding the relinquishment of Baby Girl D., B.D. interrupted the proceeding with the question "[d]on't you think we should prosecute someone?" When the court inquired as to what B.D. meant by this question, she responded that "I heard this; a man raped a woman and then killed her."

During her own testimony B.D. stated that a woman had been raped and killed at the apartment where she was living. B.D. said that the man who committed the murder was on medicine, and that was why she had stopped taking her medicine. Other witnesses agreed that no such incident had ever occurred at B.D.'s apartment.

A nurse at the hospital where the baby was born testified that she had worked the day shift on the floor where B.D. stayed following the birth. She said that when she entered B.D.'s room each morning, she typically found the toilet full of everything that was in the bathroom, including tissue and Kotex.

The nurse further testified that the second day after the baby was born, B.D. requested to see her baby. She observed that while B.D. was feeding the baby her attention span was at its longest, which was from 30 to 60 seconds. She also observed that B.D. did not hold the bottle in the baby's mouth but let it fall to her chest, and that she did not support the baby's head. In light of this behavior, B.D. was allowed to see her baby only when hospital personnel were in the room. During the nurse's testimony, B.D. interrupted the proceedings to say that she thought that her baby wanted a mama, but that it was scared of her.

While in the hospital, B.D. would stop people in the halls and tell them that the nurses were beating the babies in the nursery. On the day that B.D. was to leave the hospital, she was found in the basement near the morgue, and explained that she thought she had heard shots and was wondering who had been shot.

At the conclusion of the hearing, the court stated that if B.D. had been in the same condition when she signed the relin-

quishment as she was at the time of the hearing, then she had lacked the requisite mental capacity to execute a relinquishment. The court further determined that B.D. was not mentally capable of caring for her baby, and ordered custody of the child continued in the division pending a second hearing to be held in six months.

The second hearing was held in October of 1981, at which time a second psychiatrist, whom B.D. had seen in September of 1980 for a disability evaluation, offered testimony. The psychiatrist stated that he had subsequently seen B.D. when she was hospitalized in April of 1981, and then as an out-patient in May and June of that same year. He had diagnosed B.D. as suffering from paranoid schizophrenia, with suicidal tendencies and with delusions that certain people were plotting against her. He defined delusions as false ideas that cannot be removed by reason. He stated that B.D. had told him she was going to get a shotgun and kill those people.

The psychiatrist stated that when B.D. was hospitalized, she had been in an acute psychotic state, and that it had taken some time to get her calmed down with medication so that she could be in a ward with other people. While after a few days of treatment B.D. did in fact calm down to the point that she was cooperative and pleasant, he testified that she was still delusional when she left the hospital. This psychiatrist stated that B.D. had told him in May and July that she wanted her baby back, and that she had been talked into signing papers to give the baby up by some of the people who were plotting against her.

The psychiatrist testified that B.D.'s episodes of acute psychosis are unpredictable in terms of their onset, and may be of long or short duration. When B.D. is in an acutely psychotic state as she was when hospitalized in April of 1981, the psychiatrist stated that she becomes hyperactive, talkative, and uncooperative, and that she would be unable to look out for a child at these times because she is unable to look out even for herself. He stated that he would be most concerned about the baby's welfare if B.D. became suicidal, in light of the possibility that B.D. would kill the baby along with herself.

He stated that if she continued to take her medication and was seen on a regular basis by a psychiatrist, then the worst of her psychotic bouts might be headed off. Even when she is under medication and not suffering from acute psychosis, he regarded her to be a very sick individual.

When asked to give his opinion as to whether or not B.D. was so mentally deficient that she was unable to form an intent and to act knowingly as she would have to do in order to give her child necessary care and protection, the psychiatrist stated that he had reservations because B.D.'s condition fluctuates so much and because, like many patients with her condition, B.D. has a tendency to stop taking her medicine when she feels good. He stated there were times when she would certainly not be able to look after the child, and that she had never in fact demonstrated in any way that she was able to look after the child.

In light of the fact that no known cure exists for B.D.'s condition, he viewed her prognosis as poor, and believed that the most that could be expected would be to keep her more obvious symptoms under control by medication. He believed that the presence in the household of B.D.'s mother, the baby's grandmother, would not help B.D.'s condition in any way. He stated that if she refused treatment and medication, she would eventually have to be institutionalized.

The psychiatrist testified that paranoid schizophrenia is to some extent a hereditary condition, and that while a child living with a person who suffered from that disease would not develop the disease purely by reason of the association, a child who carried that hereditary trait might be more likely to develop the disorder if the child lived in an environment with others suffering from the disorder.

The psychiatrist recommended that B.D. lead a life with as little stress as possible so that she has only herself to worry about. He had urged her not to try to take care of

the child and believed that she would be better off without it. He said that while granting B.D. custody of the child might bring B.D. immediate joy, it would not head off her psychotic episodes, in that they come from internal factors more than from external ones.

One of B.D.'s friends also testified at this hearing. She stated that B.D. had done some babysitting for her sometime before her own baby was born. She observed that while B.D. became less talkative as her delivery time approached, she appeared to resume her talkative nature after the birth. She expressed an opinion that B.D. should not continue to live with her own mother because the two did not get along.

At the conclusion of this second hearing, the court entered judgment terminating B.D.'s parental rights, finding that B.D. was so mentally deficient that she was unable to form an intent or act knowingly. The court also found that she had substantially and continuously neglected the child or failed to give the child necessary care and protection. At the time that the judgment was entered, the grounds for termination of parental rights were set out in § 211.447 RSMo 1978, subparagraph 2(2)(g).[1] That section provided for termination of parental rights if "the parent is so mentally deficient he is unable to form an intent or act knowingly, and has substantially and continuously or repeatedly neglected the child or failed to give the child necessary care and protection."

On this appeal, the attorney appointed to represent B.D. contends that the evidence failed to support the court's finding, and that even if there was evidence to support a finding of mental deficiency as defined above, there must be evidence of past neglect in order to terminate parental rights. Because B.D. never had custody of her baby after they left the hospital, B.D.'s attorney argues that such neglect was not shown.

■ The standard for termination of parental rights has two components. The first requires a finding that the parent be so mentally deficient as to be unable to form an intent or act knowingly. It is clear to this court that B.D. satisfies this component. In the first place, B.D.'s attorney does not contest the fact that B.D. is mentally deficient within the meaning of that statute. Secondly, physicians who examined her at different times agreed on the diagnosis of her illness, and both expressed the opinion that her condition is irreversible. Both physicians stated that while medication would help control her disease, she remained delusional even while taking it. A review of the evidence as set out above convinces this court that there was ample evidence to support a finding that B.D. is so mentally deficient as to be unable to form an intent or act knowingly.

■ The second statutory component for termination of parental rights is set forth in the disjunctive, and requires a finding that the parent has either substantially and continuously or repeatedly neglected the child, *or* failed to give the child necessary care and protection. B.D.'s attorney has focused on the first part of this requirement, and contends that the evidence fails to show that B.D. substantially, continuously, or repeatedly neglected the child.

The second portion of the disjunctive requirement simply requires a finding that the parent has "failed to give the child necessary care and protection." It is significant that this portion of the second component does not include the continuous or repeated nature of acts which constitute neglect, but simply requires a finding that the parent has failed to give necessary care and protection. In short, under this second portion of the disjunctive there is no requirement that the court find neglect, and it may find only that the parent has failed to give necessary care and protection. It is understandable that there is no requirement that this failure be continuous or repeated, in that necessary care and protection contemplates more serious acts than neglect, and could involve life threatening situations.

1. Now § 211.447.2(2)(g) a and b.

The hospital nurse testified that when holding her baby, B.D. failed to hold up the baby's head or to hold the formula bottle in the baby's mouth for a sufficient period, and that her attention span toward the baby lasted only 30 to 60 seconds. The hospital personnel viewed B.D.'s behavior as posing enough of a threat to the baby's protection that they instituted a policy of not allowing B.D. to be alone with the baby without someone from the hospital staff present to make sure that the baby was being properly cared for.

This court is convinced that this behavior on the part of B.D. is a classic example of a failure to give necessary care and protection. A newborn baby is utterly helpless in respect to feeding itself. If B.D. was given custody of her baby and if she continued to be inattentive to the baby's feedings to the point that she could not keep the formula bottle in the baby's mouth, there would be a great risk that the baby would be deprived of the nourishment necessary for its survival, and would eventually die.

Similarly, a newborn baby cannot support its own neck and is very tender in the region of its head. If B.D. was allowed custody and if she continued to fail to give her baby adequate attention, protection, and care in this regard, there would be a great risk that the baby would eventually suffer serious injury.

It is true that these failures on the part of B.D. were observed only over the course of a few days, and were relatively narrow in scope. However, when the potential seriousness of these failures is considered in light of B.D.'s mental disorders as assessed by the two psychiatrists, it is apparent to this court that B.D. failed to give her baby necessary care and protection.

Thus, there is clear, cogent, and convincing evidence in this case that the best interests of Baby Girl D. were served by terminating B.D.'s parental rights. The fact that the portion of the trial court's judgment finding that B.D. had substantially, continuously, and repeatedly neglected her baby is not supported by the evidence is irrelevant, in that that criteria is an independent dis-junctive alternative of the second component of the standard for termination of parental rights.

The judgment is affirmed.

All concur.