**In the Interest of JIW, a Minor.**

**No. WD 36438.**

Missouri Court of Appeals,
Western District.

Aug. 6, 1985.

Douglas J. Patterson, Kansas City, for appellant.

Denise Phillips, Legal Aid of Western Missouri, Kansas City, guardian ad litem.

James E. Herbertson, Jackson County Juvenile Court, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and SHANGLER and SOMERVILLE, JJ.

LOWENSTEIN, Presiding Judge.

This is an appeal by the mother, BWW, through her guardian, of termination of her parental rights to her son JIW. *See* §§ 211.442–211.492, RSMo.1978 and Cum. Supp.1984. There is no known father of the child who was born out of wedlock in October 1976. Less than two weeks after the child's birth BWW, who will be referred to as the mother, was committed to a mental health facility and the physical and legal custody of JIW was placed with the Division of Family Services. Facts relevant to the three issues on appeal will be discussed under each respective point.

■ The mother contends that the trial court's order and judgment does not comply with § 211.482 which requires orders terminating parental rights to be in writing, recite the jurisdictional facts, and factually find one or more of the conditions set out in § 211.447. The first two requirements are not in contention, but the mother argues that because the court did not *specifically cite* which subsection of § 211.447 it was relying on, the order cannot stand. However, the court in *In the Interest of H.J.P.*, 669 S.W.2d 264, 271 (Mo.App.1984), held that "recitation in the court's order of the statutory bases for its decision is superflous." In the present case the judgment and order had language from and based its result in the following sections: Section 211.447.2(2)(b) and (i) and (g). As pertinent to this case, (b) refers to a termination based on neglect of the parent who does not have custody for failure to comply with a court approved plan; (i) concerns a child whose custody has been taken away by order, and the parent has failed on a continuing basis to rectify the conditions which caused the juvenile court to initially change custody; (g) is based upon a parent's mental condition which keeps the parent from forming an intent or acting knowingly, the condition is permanent or not reversible, and this has caused the parent to neglect or failure to care for the child. This court need not, as the mother suggests, select only one reason for termination and finding that reason unsupported reverse the judgment. This statute allows parental rights to be terminated if such is in the best interest of the child and *one or more* of the enumerated conditions set out are present. The standard of proof for termination under the statute is by "clear, cogent and convincing" evidence, *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984).

This court is aware in its previous opinion, *In Interest of W.F.J.*, 648 S.W.2d 210, 214 (Mo.App.1983), it held that "the severance of parent/child relationship by act of law is an exercise of awesome power and demands strict and literal compliance with the statutory authority from which the power is derived." In the present case the petition and court order are not models of

clarity, but as will be discussed later, the focus of the proof was the mother's mental illness and there is no doubt this was the basis for the court's determination. Unlike in the *W.F.J.* case, at least one of the grounds for termination was adequately pleaded and proven. This point is therefore denied.

■ The next point to consider is the sufficiency of the evidence. The mother focuses her argument on inadequate evidence to terminate under subsection (i), which involves the failure to rectify conditions that formed the basis for the child coming under the jurisdiction of the court in the first place. The mother cites *In the Interest of C.P.B. and K.A.B.*, 641 S.W.2d 456, 460 (Mo.App.1982), for the proposition that subsection (i) should not be applied to the mental illness of a parent. This court agrees that subsection (i) does not provide a blanket authorization for termination of parental rights on account of mental illness which does not rise to the level required by (g), to wit:

(g) The parent has a mental condition which:

a. Renders him unable to form an intent or act knowingly; and

b. Is shown by competent evidence to be permanent or that there is no reasonable likelihood that the condition is reversible, and such parent has substantially and repeatedly neglected the child or failed to give the child necessary care and protection;

In other words, when a child's original removal was based on the parent's mental illness, subsection (i), "failure to rectify", cannot be utilized to terminate if the parent's condition doesn't improve. However, this court will now review the record for clear, cogent and convincing evidence that the parent's mental illness under (g) will preclude her from giving the child necessary care and protection.

■ Since 1971 the mother has been treated for paranoid schizophrenia and has been in and out of mental hospitals on at least eight occasions. About a week after the child was born a friend of hers called the Western Missouri Mental Health Center describing the mother's bizarre behavior. The mother thought she had had twins and had called the Air Force looking for her children. She also tried calling her mother who was deceased. She had locked herself and JIW in their apartment. On October 16, 1976 she was committed to the Mental Health Center and JIW was placed with a foster family with whom he has remained for almost eight years.

In the year after her son's birth, the mother visited him on seven occassions. In November, 1977 a court hearing was scheduled to evaluate her regaining custody. The psychiatrist who had treated her since 1971 was going to recommend she have custody under close supervision by the Division of Family Services, but the mother did not show up in court although she had been clearly informed. Another court review was scheduled in January of 1978, but again the mother did not show.

The psychiatric reports filed as an exhibit by the Juvenile Officer are replete with examples of the mother's unstable mental condition. During one session she was described as shifting "rapidly and often in the same sentence, from events that allegedly happened at Western Missouri Mental Health Center or at the hospital where JIW was born. The mother stated that the doctor at the hospital where JIW was born had been bribed by someone who wanted a baby, but was sterile. She said the doctors pronounce 35% of all illegitimate babies dead at birth because they had been bribed by sterile married women who wanted to adopt a baby. The reason these women did not go through normal adoption procedures is that being sterile made them insane and the authorities wouldn't let an insane person adopt a baby."

BWW's psychiatrist of nine to ten years testified that since 1977 her mental status varied considerably and that by 1980 it was his opinion her parental rights be terminated. This was based on her number of rehospitalizations, her lack of steady employment, her frequent residence changes, and her infrequent contacts with JIW.

This doctor concluded that she would never maintain a stable mental status or social-economic function, nor would she be able to maintain a home environment for the child.

A June 11, 1982 evaluation made these conclusions:

[O]bservations of JIW and his mother together in our first contact gave the impression of a mother who had great difficulty and little success in separating her needs from JIW's. At one point in the initial session, BWW stated that if visits with JIW were taken away, she would kill herself. This statement was made in the presence of JIW whose behavior appeared quite anxious. At the same time, BWW made it clear she did not want to resume care for JIW at this time.

An August 6, 1982 evaluation made by another psychiatrist had the following conclusions:

She rationalized her inability to keep regular monthly visits with the child because of her busy work schedule. She was unable to recognize and admit though, that she was unable to keep these monthly visits even when she was unemployed. Her judgment during interview has repeatedly shown impairment. Her insight is poor. She believes there is nothing wrong with her because she is "not eligible for disability payments."

Although she is not ill enough to require hospitalization at this time, she has several features of illness that make her unable to recognize reality from fantasy, and unable to make appropriate judgments based on rational thinking.

I have not also been able to find a chance of possible long-term remission of illness secondary to compliance with treatment plans as her insight is poor and medication is viewed only as an addiction and not as a treatment. This view also makes it possible for medication to be misused.

At trial two social workers testified that the Division of Family Services had worked with the mother to establish two court-approved treatment plans so that she could regain custody. Both times she refused to sign the plans, and she failed to complete the requirements which included attending counseling sessions, maintaining steady employment, remain at the same residence, provide $5/week support for JIW, write a letter or postcard once a week to JIW, and consistently take her medication for her mental illness. When BWW was asked why she only visited JIW on 15 of the 21 scheduled visits over three years (from 1981 to 1983), she claimed cancellations were due to inclement weather. When confronted with social worker's testimony that JIW was passive and upset on the visits she did make, the mother stated that once no one could observe them, he was animated, talkative and happy. She further testified she felt the two social workers were against her and that she felt persecuted.

It is clearly the perogative of the trial court to determine the credibility of the witness and accept or reject testimony. *In re Adoption of W.B.L., supra*, at 455 (Mo. banc 1984); *In the Interest of D.V.V.*, 677 S.W.2d 396, 402 (Mo.App.1984). The Missouri Supreme Court has specifically applied the *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), standard of review to termination cases. In the *W.B.L.* case *supra*, at 454, the court explained that the clear, cogent and convincing standard of proof is met

when the evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction the evidence is true. Accordingly this standard of proof may be met although the court has contrary evidence before it. Likewise, evidence in the record which might have supported a different conclusion does not necessarily demonstrate that the trial court's determination is against the weight of the evidence. (Citations omitted.)

Although the mother expressed a present desire to have custody of the child, her testimony, read as a whole actually corroborated the Juvenile Officer's case that she

was mentally unstable. The extensive medical and DFS records, admitted without objection, provide by clear, cogent and convincing evidence that giving the mother custody would have a detrimental effect on JIW. Based on the same standard there was more than ample evidence that the best interest of the child would be served and protected by the termination. *In Interest of M.N.M.*, 681 S.W.2d 457 (Mo.App. 1984). There is no firm belief that the trial court's judgment was wrong, therefore the point on evidence being insufficient is denied. *In the Interest of G.C.P.*, 680 S.W.2d 429, 430 (Mo.App.1984). The termination under § 211.447.2(2) was proven by clear, cogent and convincing evidence, as to mental condition (g), and that ground alone is sufficient. *G.C.P., supra* at 430; *M.N.M., supra,* at 460.

Giving due deference to the court who saw and heard the witnesses and examined the reports, the judgment as to mental condition is affirmed. *W.B.L., supra,* at 455. Under the analysis of (g) as contained in *In Interest of Baby Girl D.*, 651 S.W.2d 195, 198–99 (Mo.App.1983), the termination must stand. First, the mother is so mentally deficient as to be unable to form an intent or act knowingly. Her condition is not reversible, but only controllable—but she does not take her medicine. Secondly, a finding of either disjunctive requirement of either repeated neglect or failure to give the necessary care and protection is justified.

Because of the judgment of termination on the basis of mental condition, it is not necessary to examine for sufficiency the portion of the judgment under (b) for failure to follow the plans, and to further decide whether a judgment under (g) and (b) is inconsistent (*e.g.* if a finding of mental condition, can the person have the mental capacity under (b) to neglect the child, or as here to understand and follow a plan). Particular attention is called to this court's opinion in *M.N.M., supra,* where it was said the standard of proof to support neglect could hardly be met when the parent's mental problems showed her to be unable to form the intent to neglect. 681 S.W.2d at 460.

The third and last point on appeal is somewhat confusing. The following events and motions give the background.

August 31, 1983—a petition to terminate the mother's parental right was filed by the Jackson County juvenile officer. A guardian ad litem was appointed for the child.

October 20, 1983—Attorney Patterson, as appointed guardian ad litem for the mother filed an answer. He also applied for the court to appoint an attorney, "to represent *her and the guardian's* interest in ... the matter." (Emphasis added.) The application claimed the mother did not have sufficient funds to retain her own attorney. The application then prayed the court to appoint an attorney for the *guardian.*

November 30, 1983—The court denied the guardian's request to appoint a lawyer for the guardian noting she was adequately represented by the guardian ad litem who was a lawyer.

February 21, 1984—In what was captioned as a "Reapplication," the guardian asked the judge to appoint counsel for the mother and himself. Patterson alleged the mother had experienced a setback in her condition as a result of not taking her medication. He told the court she had not been able to "prepare herself and/or to adequately assist her guardian" in the termination action. This second application stated the mother's interests were not being adequately represented by, "having one person as her guardian and the same person as her attorney." He perceived his role as amounting to a conflict of interest, *i.e.,* representing the mother which may not represent his attitude, "in the status of Guardian." Patterson's application further said he as guardian was having trouble communicating with the mother and getting direction from her and could not also act as attorney for her. In sum, he said his position placed him in a conflict. His prayer read as follows:

WHEREFORE, Applicant Douglas J. Patterson, Guardian Ad Litem for BWW

as well as the present attorney for BWW prays this court for an order appointing an attorney for BWW and/or her Guardian Ad Litem, counsel fees to be taxed as costs in this proceeding as the court may determine and for such other relief as the Court may deem just and proper.

The court treated this re-application as a request for an order for appointment of counsel for the *guardian,* and denied the motion.

The motion for new trial and the point on appeal allege error of the juvenile judge in not appointing counsel for the guardian. The motion and suggestions are to the effect Patterson's dual role kept the mother's interests from being properly represented. The suggestions say Patterson as her attorney was uncertain as to what was in the best interest of his client as to her actual needs and wishes, "which, as a practical matter, may not have represented the attitude of ... Patterson in the status of guardian ad litem." Re-trial is requested with separate appointed counsel for the mother (and the guardian), or a lawyer for the guardian (who was a lawyer).

This confusing point is denied. At no time has any complaint been raised as to the appointment of a guardian ad litem for the mother. Once the guardian entered the case for the mother she had no need to still be in the case, other than to be subject to the judgment. The duties of the appointed guardian are to take all necessary steps to promote and protect the ward in the litigation, *Hemphill by and through Burns v. Hemphill,* 316 S.W.2d 582, 587 (Mo.1958); *In Re M------,* 446 S.W.2d 508, 513 (Mo.App.1969). The assertion of a need to have a separate attorney for the mother, when she already had a guardian lacks any merit. Likewise, if the guardian, as was the case here, is an attorney, it would be duplicative to have an attorney appointed for him. The guardian on appeal argues his dual position may have caused a potential conflict. This speculation does not serve as the basis to reverse. An appellate court shall not reverse any judgment unless the error committed materially affected the merits of the trial under review. *Pratt v. Cudworth,* 637 S.W.2d 720, 724 (Mo.App.1982); Rule 84.13(b). There is nothing inherently improper for a guardian who is a lawyer to also act as counsel. *Ragan v. Looney,* 377 S.W.2d 273, 276 (Mo. 1964).

The judgment is affirmed. No costs.