In re **S.P.W., K.L.W., and C.A.W., Juveniles,**

**JUVENILE OFFICER, Respondent,**

v.

**Deanna WARD, Appellant.**

**No. WD 36207.**

Missouri Court of Appeals, Western District.

March 18, 1986.

Rehearing Denied April 30, 1986.

Clyde W. Curtis, Shook, Hardy & Bacon, Kansas City, for appellant.

James E. Herbertson, Jackson County Juvenile Court, Kansas City, for respondent.

Before NUGENT, P.J., and PRITCHARD and CLARK, JJ.

NUGENT, Presiding Judge.

The mother, Ms. Deanna Ward, appeals the circuit court's judgment terminating her parental rights in her three children. She complains first, that the court erred in considering the children's social files and admitting into evidence some of the records of the Wayne Miner Medical Center and the Blosser Home for Children. She then argues that without the inadmissible material the juvenile officer failed to adduce clear, cogent and convincing evidence to support the court's termination of her parental rights. We reverse.

■ To terminate a mother's rights in her children, the evidence of one or more of the statutory conditions set forth in § 211.-447.2(2) must be clear, cogent and convincing. *In re A.R.S.*, 609 S.W.2d 490, 491 (Mo.App.1980). A judgment in a court-tried case terminating parental rights will be affirmed unless no substantial evidence supports it, unless we are firmly convinced that it is against the weight of the evidence or that it erroneously declares or misapplies the law. *Juvenile Office v. M.E.J.*, 666 S.W.2d 957, 960 (Mo.App.1984). The admission of improper evidence in a court-tried case terminating parental rights is not a ground for reversal unless upon exclusion of the inadmissible material the remaining competent evidence is not sufficient to support the court's judgment. *Id.*

Because we hold that the evidence was insufficient to support the findings of the juvenile court, we reverse the judgment and remand.

Soon after she was born in 1948, Ms. Ward was removed from her mother's custody. In 1963, she was committed to the Fulton State Hospital and later committed to the Marshall State School and Hospital. There she was found to be mildly retarded and to have a personality disorder. In 1975, the Jackson County Probate Court declared her legally incompetent, but in 1979 she moved into the community, and in 1980 she was adjudicated competent.

In 1978, while still legally incompetent and in the care of a guardian, she gave birth to S.P.W. Three weeks after his birth, the juvenile court ordered that custody of the child be placed with the Division of Family Services (DFS) under the provisions of §§ 211.031 and 211.181.[1] In October 1979 while still legally incompetent she gave birth to K.L.W., and the court placed the child in the custody of DFS under §§ 211.031 and 211.181. Ms. Ward's third child, C.A.W., was born on May 11, 1981. By that time, she had been declared competent, but the court awarded custody of that child to DFS pursuant to §§ 211.031 and 211.181.

On August 16, 1983, the Jackson County Juvenile Officer filed three petitions to terminate Ms. Ward's parental rights of her three children. The petitions allege the same grounds for termination: First, sounding under § 211.447.2(2)(b), each petition charges that Ms. Ward had failed to care for the children on a continuing basis to the extent that she was able and that she had failed reasonably to comply with a court-ordered treatment plan. Second, in the language of § 211.447.2(2)(g), that Ms. Ward has a mental condition which renders her unable to form an intent to act knowingly and that no reasonable likelihood exists that her condition is reversible. Third, based on § 211.447.2(2)(i), that the children had come under the jurisdiction of the juvenile court pursuant to §§ 211.031 and 211.-181, that the children had been under the court's jurisdiction for more than a year before the petition for termination was filed, that Ms. Ward had failed to rectify

1. Unless otherwise indicated, all sectional references are to Revised Statutes of Missouri, 1978.

the conditions which caused the court to take custody of her children, and that no reasonable cause existed to believe that she would rectify the conditions in the future.

A consolidated hearing was held on March 1, 1984. Ms. Ward was represented by counsel, and the children were represented by their guardian ad litem. The father did not appear. The court terminated his parental rights on the ground of neglect, and that decision is not contested here.

The main witness presented by the juvenile officer was Karen Levy, an employee of the DFS who has been Ms. Ward's case worker since 1979. Ms. Levy testified that the goal of the DFS was to return custody of the children to Ms. Ward. To accomplish that goal, the DFS referred Ms. Ward to various programs and agencies that attempted to help her rectify her personal problems of low self-esteem, lack of self control, and lack of social skills, and to teach her hygiene, housekeeping, budgeting, cooking, nutrition, and child care, management and discipline.

The DFS referred Ms. Ward to numerous public and private agencies, but she failed in all of the programs. She either voluntarily left before the program was completed or was asked to leave because she could not get along with staff members or other patients or she failed to meet the goals of the program.

Ms. Ward and her child K.L.W. resided at the Blosser Home For Children for a little over three weeks in November of 1979. The home teaches "parenting" and homemaking skills and offers employment training. Patricia Wood, the director of the Blosser Home, observed Ms. Ward's progress while she was a resident. The staff tried to teach Ms. Ward how to care for her infant child, but she would not cooperate. In one incident Ms. Ward would not follow instructions on feeding the child, causing the child to be hospitalized. Although at times Ms. Ward seemed to understand an instruction, she would not carry it out in practice. On occasion, she became angry when a staff member tried to correct or instruct her. The home asked her to leave because she posed a threat to herself and others.

Ms. Ward participated in a 1982 court-ordered treatment program to which she and her attorney agreed. She was told that if she failed to meet the goals of that program the DFS would seek to terminate her parental rights. The plan required her to attend weekly counseling sessions and to try to control her anger, her outbursts and suicide threats. She was unable to understand that her children were not the same as adults and was unable to relate to them as children. Ms. Levy testified that Ms. Ward did not successfully complete the program because of her inability to address her personality problems. Although other plans were proposed to Ms. Ward, she would not agree to them. Ms. Levy concluded that no program was available that could help Ms. Ward, and she recommended that her parental rights be severed.

Michael Kellerman, a licensed clinical psychologist,[2] treated Ms. Ward over a period of eighteen months in 1980 and 1981 at the Swope Parkway Mental Health Center. His impression was that Ms. Ward suffers from an "intermittent explosive disorder" which is possibly organically caused. He recommended that such disorder "be ruled out" by a psychiatrist or neurologist. He noted that, according to the center's records, a Dr. Ratman, an otherwise unidentified "psychiatrist," had made a diagnosis of "intermittent explosive disorder," a condition characterized by an inability to control one's anger and a low tolerance for frustration. Mr. Kellerman testified that possibly she would learn to control her

2. Mr. Kellerman at the time of his testimony had earned a master's degree in clinical psychology and had completed all of his course work and his dissertation toward a doctor's degree in "counseling psychology."

behavior over a number of years, but he also stated that a "high probability" existed that she would not make a good parent. If she suffered from explosive personality disorder, it would certainly be a detriment to her being a parent.

Joyce Carter, a psychiatric social worker and supervisor at Wayne Miner Mental Health Center, conducted "parenting" skills classes attended by Ms. Ward and counseled her. She testified that Ms. Ward was reluctant to address her personal problems such as impulsiveness, lack of self-control, lack of social skills and unchecked anger, and that unless she successfully did so she would never be able to function as a parent.

Ms. Carter also observed Ms. Ward's supervised visits with her children. She stated that the children would be endangered if returned to their mother. She further testified that Ms. Ward was unsuccessful in the Wayne Miner program, and she could not think of a "parenting" program that would aid her unless she rectified her personal problems. She saw Ms. Ward from May, 1980, to July, 1982.

Between December, 1982, and August 31, 1983, Betty Weger, a psychologist and therapist with Briscoe-Carr Consultants, counseled Ms. Ward and developed a treatment plan for her. She saw Ms. Ward's main problem as her inability to control her anger. Ms. Ward failed to achieve the program's goals, and the program was cancelled. Ms. Ward continued to exhibit constant anger; almost anything would frustrate her. The counseling did not work. The therapist doubted that Ms. Ward would ever change and recommended that the DFS seek to sever Ms. Ward's parental rights mainly because her uncontrollable anger posed a threat to the physical safety of the children.

Throughout the time after the births of her children until the date these petitions were filed, Ms. Ward regularly continued to visit her children on schedules set by DFS and her counsellors. Ms. Levy testi-fied that she and Ms. Ward never missed the regularly scheduled visits with the children, including hospital visits. Ms. Ward looked forward to those visits.

At trial, Mr. Curtis, Ms. Ward's counsel, objected to the introduction of records of the Blosser Home about Ms. Ward. The juvenile officer attempted to qualify them under the business records exception to the hearsay rule, but Mr. Curtis objected that some of the materials were not admissible under that exception, were double hearsay, irrelevant, outside the scope of the pleadings or contained expert opinion for which no foundation had been laid. The court conditionally admitted the records pending the filing of written specific objections. Mr. Curtis filed the written objections, but the court did not rule on them.

Western Missouri Mental Health Center's records on Ms. Ward were conditionally admitted as business records. Mr. Curtis objected to many of the records as being outside the scope of the pleadings and objected that a report of an outside consultant could not be qualified as a business record by the center's custodian of records.

The court also admitted into evidence the voluminous social files on each child. They contain the children's social reports and all other documents about the children, including pleadings, investigative reports, evaluations, correspondence, agency and school records, referrals, and medical records. The juvenile officer did not attempt to qualify them on any ground, and they were conditionally admitted pending the filing of specific written objections. Mr. Curtis filed the objections at the close of the case, but the court did not rule on them.

The court made written findings of fact in which it found that clear, cogent and convincing evidence proved the following: Ms. Ward suffers from a mild mental retardation compounded by a personality disorder of an intermittent explosive type. She cannot learn the basic "parenting" skills and no reasonable likelihood exists that she will ever do so. The personality disorder is

incurable, although controllable with medication and counseling. Coupled with the mental retardation, it results in aggressive, hostile and inappropriate response to minimally stressful situations and an inability to pursue counseling and education. It also produces an inability to provide for herself and her children a stable environment as well as an inability to maintain a stable mental status or to adhere to a regular schedule of medication or counseling. No reasonable likelihood exists that in the future she will be able to work and to get adequate housing for herself and her children. Her condition will affect her ability to act as a parent, cause her to exercise poor judgment and to have little insight into the consequences of her condition and her ability to provide a safe environment and care, custody and support for her children.

In addition, the court found that each child has been out of Ms. Ward's custody since shortly after birth and that each now has numerous ailments. KLW suffers from ear infections requiring insertion of tubes in his ears, some loss of vision and an epileptic type of disorder which causes seizures and requires constant watching, care and medical treatment. The child SPW is allergic to many types of food which cause him nausea and diarrhea, and CAW has a congenital depression of his chest cavity which causes chronic respiratory infections, frequent emergency care and increased susceptibility to pneumonia. That condition will probably require surgery. All three children are said to be in fragile health. The court concluded that the complexity of these problems is beyond Ms. Ward's capacity to handle and creates for her extremely stressful situations beyond her low tolerance for stress.

The trial court concluded that the evidence established that Ms. Ward had failed to comply with the court-approved treatment plan to which she had agreed in 1982 and that the plan had failed. It also concluded on the basis of the evidence that Ms.

Ward cannot form an intent or act knowingly, a condition in all reasonable likelihood permanent and irreversible and that she has failed to give the children necessary care and protection. Those findings led the court to the further conclusion that those conditions formed the basis of the removal of the children under §§ 211.031 and 211.181, that no reasonable cause appears to believe that she will or even can rectify those conditions despite reasonable, diligent and continuing efforts of the DFS, and that the best interests of the children will be served by the termination of her parental rights. Thereupon, the court terminated her rights.

### I. *Admission of Evidence*

Ms. Ward's first point is that the court erred in admitting into evidence the social files on each of the children. The juvenile officer did not attempt to qualify their admission on any ground. Mr. Curtis filed specific written objections to specific portions of the files, but the court never ruled on the objections.

The juvenile officer argues that § 211.472 is an implicit exception to the hearsay rule and authorizes their admission into evidence without further qualification. § 211.472 provides in part:

> In all proceedings for termination of parental rights of a child, except those filed under subdivision (1) of subsection 2 of section 211.447, an investigation and social study shall be made by the juvenile officer, the state division of family services or other public or private agency authorized or licensed to care for children as directed by the court, *and a written report shall be made to the court to aid the court in determining whether the termination is in the best interests of the child.* It shall include such matters as the parental background, the fitness and capacity of the parents to discharge parental responsibilities, the child's home, present adjustment, physical, emotional and mental condition, and such other facts are as

pertinent to the determination.... (Emphasis added.)

The mother argues that the statute only authorizes the court to consider a written report prepared by the juvenile officer, the DFS or other public agency licensed to care for the children.

Such a report on each child was prepared by the DFS. The statute clearly provides that a written report complying with § 211.472 may be considered by the court in determining whether termination of parental rights is in the child's best interest. *D.E.J. v. G.H.B.*, 631 S.W.2d 113, 118 (Mo. App.1982).

Nevertheless, the statute provides that the report is to be considered by the court only in determining whether termination is in the child's best interest. Ms. Ward argues that a hearing for termination of parental rights should be bifurcated. The social report should be considered by the court only after it has decided that statutory grounds exist requiring termination. She finds support for her argument in § 211.447.2 which provides:

> The Juvenile court may, upon petition filed by the juvenile officer under this section, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:
>
> ....
>
> (2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist....

The statute then goes on to list the conditions that must be found to terminate parental rights.[3]

We see no need to impose a requirement to divide the trial into two parts. The statute does not require it. Trial judges are perfectly capable of receiving some evidence for one purpose and not another.

■ In such termination cases, the first concern of the trial court is to focus on the issue of the severance of the parent's personal rights. The juvenile officer has the burden of establishing by clear, cogent and convincing evidence one of the statutory grounds of § 211.447.2(2) for termination of those rights. All the rules of evidence strictly apply. The severance of the parent-child relationship is an exercise of awesome power which requires literal compliance with statutory authority. *In re W.F.J.*, 648 S.W.2d 210, 214 (Mo.App.1983). By requiring strict compliance with the rules of evidence, we help to insure that a decision to terminate parental rights is made only on reliable, credible and relevant evidence. We guard the truth finding process with the rules of evidence in less important matters, and we see no reason why strict adherence should not be required here. The social reports would not be admissible in connection with this first concern of the court unless they were properly qualified. *See In re A.R.S.*, 609 S.W.2d 490, 491 (Mo.App.1980).

The United States Supreme Court has held that due process requires that a state may only sever a parent's rights in her child upon clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982). The Court stated that requiring this degree of proof will lessen the risk of error where such an important personal liberty interest is at stake. Our decision comports with that concern because in requiring strict adherence to the rules of evidence on the issues involved in determining whether statutory grounds for termination exist, we reduce the risk of error.

■ In termination cases, the second question for the court is whether termination of parental rights is in the best interest of the child. In connection with that issue, the court may consider the social report prepared pursuant to § 211.472.

In this case, however, the social files contained numerous other documents be-

---

**3.** *See also* § 211.482 which requires the court to make factual findings that one of the conditions of § 211.447 exists and that termination is in the child's best interest.

side the social reports. Ms. Ward urges that among these exhibits only the social reports may be considered by the court in determining whether termination of parental rights is in the child's best interest. We agree.

Section 211.472 requires that an investigation and a social study be made and a written report be compiled which may be considered by the court in determining whether termination is in the child's best interest. *See D.E.J. v. G.H.B., supra,* 631 S.W.2d at 118. It does not authorize the court to consider other materials that may be compiled in the course of the investigation. In termination cases, literal and strict compliance with statutory authority is required. *In re W.F.J., supra,* 648 S.W.2d at 214. We find no statutory authority for the court to consider any additional material besides the authorized social report.

Although the court erred in admitting the complete social files, in this case we would not reverse if upon exclusion of the inadmissible evidence we could find that the competent evidence was sufficient to support the court's finding that one of the statutory grounds for termination exists. Unfortunately, that is not the case, which brings us to Ms. Ward's second point.

## II. *The Three Grounds for Termination*

In this case the juvenile officer sought termination on the basis of three separate statutory grounds. First, he charged in his petitions that Ms. Ward had neglected her children within the meaning of § 211.447.-2(2)(b) in failing to comply with or in unsuccessfully complying with a court-approved plan. Second, the petitions alleged that Ms. Ward has a mental condition that renders her unable to form an intent or act knowingly and no reasonable likelihood exists that her condition is reversible. § 211.-447.2(2)(g). Third, invoking § 211.447.-2(2)(i)b, the juvenile officer pleaded that the mother had failed to rectify the conditions which had led to the removal of the children from her custody under § 211.031.

### A. *Mental Illness*

The present statute providing for termination of a parent's rights to a child is the product of amendments of the 1959 version of the parental rights law. The 1959 provision for terminating the parental rights of a mentally ill person, § 211.441.1(2), read in part as follows:

1. The juvenile court may ... terminate all rights of parents to a child when it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

. . . .

(2) When it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition

. . . .

(e) The parents have been found incompetent under chapter 475, RSMo, and are incapable, and there are reasonable grounds to believe that they will continue to be incapable of giving the child necessary care and protection.

In 1973 § 211.441 was repealed and replaced by § 211.447, which included the following provisions:

2. The juvenile court may ... terminate the rights of a parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

. . . .

(2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist:

. . . .

(g) The parent is so mentally deficient he is unable to form an intent or act knowingly, and has substantially and continuously or repeatedly neglected the child or failed to give the child the necessary care and protection; ....

Finally, in 1982 the legislature refined § 211.447 so that paragraph (g) now reads:

(g) The parent has a mental condition which:

a. Renders him unable to form an intent or act knowingly; and

b. Is shown by competent evidence to be permanent or that there is no reasonable likelihood that the condition is reversible, and such parent has substantially and repeatedly neglected the child or failed to give the child necessary care and protection....

The progression of these amendments manifests the legislature's increasing willingness to limit the ability of the juvenile court to terminate parents' rights in their children. In 1959 an adjudication of incompetency and a showing of continuing "incapability" was sufficient. An incompetent was a person incapable by reason of insanity, mental illness and the like of managing his property or caring for himself. § 475.-010, Revised Statutes of Missouri, 1959. By 1982, however, the test had become much more stringent. The statute now requires, first, a finding of a mental condition rendering the parent "unable to form an intent or act knowingly." Next, the court must find the condition to be permanent or not reasonably likely to be reversible. Finally, it must conclude that a parent so afflicted has substantially and repeatedly neglected the child or failed to give the child necessary care and protection. Section 211.447.2(2)(b) defines "neglect" as

the failure of a parent to provide, on a continuing basis, the care, guidance and control necessary for the physical, mental, and educational well-being of a child; or the failure to provide a child who is in the legal or actual custody of others with a continuing relationship, such as, but not limited to, communication or visitation, and, to the extent the parent is financially able, to provide for the child's care....

Thus, if the juvenile officer chose to rely upon Ms. Ward's mental illness as the ground for termination of her rights, he had to prove "by competent evidence" not only that she was unable to form an intent or to act knowingly, but that her condition was permanent or very likely irreversible and that she "substantially and repeatedly neglected" the children while they were in the custody of the DFS and their foster parents.

▇ The statute does not define "unable to form an intent or act knowingly," but in context the meaning of those words is apparent. The meaning of statutory words can be found in the general purpose of the legislative enactment. *Bank of Crestwood v. Gravois Bank*, 616 S.W.2d 505, 510 (Mo. 1981) (en banc). A court may find additional clues to the legislature's meaning in identifying the malady the legislature sought to cure. *Sermchief v. Gonzales*, 660 S.W.2d 683, 688 (Mo.1983) (en banc). To accomplish the purpose of the legislature to protect the best interests of the children, the words "to form an intent or act knowingly" need only refer to the ability of the parent adequately to nurture, care for and protect the children. A parent's mental condition may be such that he cannot form an intent to commit a crime or cannot knowingly violate the law and yet be such that he can adequately take care of his child. Otherwise, the last requirement of subdivision (g) would be superfluous because, beyond the parent's mental condition, the last finding of the court must be that by his conduct the parent has "substantially and repeatedly neglected the child or failed to give the child necessary care and protection."

Any one of those three grounds alleged in the plaintiff's petitions would support termination if proved, *In re H.J.P.*, 669 S.W.2d 264, 273 (Mo.App.1984), but the juvenile officer here tried to prove all three grounds without regard to the inherent inconsistencies in such charges: If, as charged in the second ground, Ms. Ward's mental condition made her incapable of forming an intent or acting knowingly, she could not be held responsible for having failed reasonably to comply with a court-

approved plan or with being unsuccessful with such a plan so as to justify a finding of neglect under § 211.447.2(2)(b). *In re M.N.M.*, 681 S.W.2d 457, 460 (Mo.App. 1984). Likewise, she could not be held responsible under § 211.447.2(2)(i)b for failing to rectify. *In re C.P.B.*, 641 S.W.2d 456, 460–61 (Mo.App.1982).

Nevertheless, the court's termination order found that all three grounds existed and justified termination.

We could disregard as surplusage the first and third grounds of the juvenile court's order if the evidence were sufficient to establish that Ms. Ward lacked the mental capacity to form an intent or to act knowingly as set out in § 211.447.2(2)(g). For that reason we look first to the evidence bearing on her mental condition.

The essential elements of a cause of action under § 211.447.2(2)(g) are, first, that the parent be suffering from a mental condition (a) which renders him either unable to form an intent or to act knowingly and (b) which is shown by competent evidence to be permanent or not reasonably likely to be reversible, and, second, the parent has substantially and repeatedly neglected the child or has failed to give the child necessary care and protection.

In this case, despite evidence that Ms. Ward perhaps suffers from an "intermittent explosive personality disorder," neither that condition nor any other mental condition that causes an inability to form an intent or to act knowingly was established by competent medical or psychiatric testimony. Even the diagnosis of intermittent explosive personality disorder was tentative. Psychologist Michael Kellermen testified that Ms. Ward should be examined by a psychiatrist to "rule out" that disorder, but he was not asked about and expressed no opinion whether an explosive personality disorder would cause Ms. Ward to be unable to form an intent or to act knowingly.

No medical or psychiatric testimony about Ms. Ward's mental condition was offered despite the fact that Ms. Ward's case worker testified that Ms. Ward had undergone six or eight "psychological-psychiatric evaluations and consultations." She noted that the reports of those consultations spoke of Ms. Ward's inability to control her temper, her explosive personality disorder, her low self-esteem, and her lack of parental and social skills.

In summary, the evidence against Ms. Ward, coming entirely from non-medical witnesses, was that she was markedly impulsive and more than mildly irritable, had substantial anger outbursts, was suspicious toward authority, was moderately to severely impaired in judgment, suffered depressed moods and had a depressive life style, exhibited anxiety, was intellectually deficient, had money management problems, was hostile and belligerent to strangers and emotionally immature, could not control her environment, and was potentially dangerous to others.

We have found no comparable Missouri case of parental termination based upon the parent's mental condition which was not based upon some competent medical, neurological or psychiatric evidence. In contrast, a number of recent cases have terminated parents' rights on the basis of such medical evidence. *See*, for example, *In re JIW*, 695 S.W.2d 513, 515–17 (Mo. App.1985); *In re B.J.D.B. v. J.B.G.*, 698 S.W.2d 328 (Mo.App.1985); *In re M.N.M.*, 681 S.W.2d 457, 459–60 (Mo.App.1984); *In re H.J.P.*, 669 S.W.2d 264, 272–73 (Mo.App. 1984); and *In re Baby Girl D.*, 651 S.W.2d 195, 196–98 (Mo.App.1983).

In the case of *In re B.J.D.B. v. J.B.G.*, this court recently affirmed a termination of a mother's rights based upon an "overwhelming corpus" of medical records in evidence which supported the trial court's inference that the mother's mental condition caused her to be unable to form an intent or to act knowingly. The mother had been first treated for a mental disorder in 1964 at age 21, and between then and the filing of the August, 1983, petition for

termination had been hospitalized in this state for treatment of her mental condition more than a score of times, including one seventeen-month stay in the St. Joseph State Hospital, plus hospitalizations and treatment in four other states. She had been diagnosed as suffering from "an affective disorder, either of a manic depressive or schizoaffective nature, schizphrenia of a chronic undifferentiated type, depressive neurosis, schizoid personality, atypical manic-depressive compounded by habitual excessive drinking and other substance abuse and emotional immaturity and chronic free-floating anxiety." Although the opinion speaks of no direct medical or psychiatric testimony, the mother's hospital records were in evidence apparently without objection. In effect, this court held that evidence of the mother's extraordinary nineteen-year history of unrelenting serious mental illness and her copious medical records were sufficient to sustain the juvenile court's finding under § 211.447.2(2)(g) without specific medical testimony that, in the words of the statute, she was unable to "form an intent or act knowingly." On the other hand, *In re JIW, supra,* held that psychiatric testimony which described the mother as "unable to recognize reality from fantasy, and unable to make appropriate judgments based on rational thinking" and the psychiatrist's inability "to find a chance of long-term remission of illness" was sufficient to satisfy the statute's demands. Such testimony obviously paraphrased the statutory language.

The remaining cases cited above all involved the use of direct and specific medical evidence of the parents' "inability to form an intent or act knowingly." Obviously, if it is available, that is the best evidence, and the juvenile officer should obtain and introduce such medical evidence of the parent's specific mental condition. The question of a person's mental condition and his ability to "form an intent and act knowingly" and, more particularly, the question of the permanency or the likelihood of reversibility of a diseased mental

condition is a medical, specifically, a psychiatric question. Layman may testify, for example, to bizarre conduct of a parent from which a court might conclude that the parent is suffering from a mental ailment. *Cf. Connecticut Mutual Life Insurance Co. v. Lathrop,* 111 U.S. 612, 620–21, 4 S.Ct. 533, 536–37, 28 L.Ed. 536 (1884); *Parks v. Marshall,* 322 Mo. 218, 14 S.W.2d 590, 595 (1929); *State v. Clark,* 546 S.W.2d 455, 469 (Mo.App.1977). But testimony regarding the specific nature of such an ailment, its disabling potential and its permanency is peculiarly within the realm of medicine, particularly psychiatry, and is not within the competency of laymen, even a psychologist specializing in counseling. In this case, the psychologist himself deferred to the medical expertise of a psychiatrist to "rule out" the suspected explosive personality disorder, but no psychiatrist was called. Even the psychologist was not asked to express an opinion regarding the disabling effect of Ms. Ward's condition in terms of her ability to form an intent or act knowingly. All he could say was that a "high probability" existed that she would not make a good parent and that, if she suffered from an explosive personality disorder, it would be a detriment to her being a parent. The statute, however, does not authorize termination of parental rights simply because one may not be a good parent. Even bad parents have rights which the courts may not lightly terminate.

Unquestionably, in this case psychiatric evidence was available to counsel for the juvenile officer as it also appears to have been available in both of the recent cases coming to us from Jackson County, *In re B.J.D.B. v. J.B.G., supra,* and *In re JIW, supra,* almost literally from across the street. No reason appears in this record for not calling upon readily available psychiatrists to testify, if only by deposition, regarding this parent's mental condition. If necessary, at least in the urban counties of Missouri, the juvenile officer has psychiatric experts available to examine and evaluate a parent if no such examination has

recently been made. All areas of the state have readily available medical practitioners to make such evaluations. In parental termination cases, juvenile courts should insist upon the testimony of such readily available psychiatric and medical experts.

■ The juvenile officer's failure to adduce the available psychiatric evidence concerning this mother's mental condition and its permanency and effect is fatal to the case he may have had under § 211.447.2(2)(g). Therefore, we next examine the case presented under the neglect provisions of the statute, § 211.447.2(2)(b).

### B. *Neglect*

Where the children are in the custody of others, as here, to terminate a parent's rights under § 211.447.2(2)(b) the juvenile officer must prove the following facts: *First,* for a period of six months, the parent without good cause has constantly failed to provide the children a continuing relationship (for example communication or visitation). *Second,* the parent has failed to provide for the children's care to the extent that the parent is financially able. *Third,* an "appropriate plan" has been devised. *Fourth,* the court has approved the plan. *Fifth,* the parent has failed reasonably to comply or has been unsuccessful in complying with the plan. *Sixth,* the parent had at least ten days notice of the plan and a chance to request a hearing on it. Except for the alternatives within the fifth element, § 211.447.2(2)(b) states the foregoing elements in the conjunctive. Thus, the juvenile officer must prove "by clear, cogent and convincing evidence" (§ 211.447.2(2)) all of those elements, including either the parent's failure reasonably to comply or the unsuccessful compliance with the plan. If he fails to prove any one or more of those elements, his case under subdivision (2)(b) fails. *In re D.L.H.,* 660 S.W.2d 471, 473 (Mo.App.1983), and *In re W.F.J.,* 648 S.W.2d 210, 215 (Mo.App.1983).

■ Ms. Ward here complains that the juvenile officer failed to prove by clear, cogent and convincing evidence at least two of the elements of this termination action: that she failed to provide her children with a "continuing relationship" and that she failed to support her children within her means to do so. She is correct. The juvenile officer's evidence abounds with examples of Ms. Ward's constant maintenance of contact with her children. Considering her separation from the children, she did all she could to nurture and continue her relationship with the children, attending every scheduled visitation with them. The juvenile officer's brief does not deny that she did so. (In fact, his brief, and we use that term charitably, does not mention Ms. Ward's contention on this point or on any other point related to the sufficiency of the evidence.) The evidence totally failed to establish that Ms. Ward neglected her children by a failure to provide a "continuing relationship" with them.

In addition, the testimony of the plaintiff's witnesses does not address the subject of the mother's ability to provide financial support for her children or any declination by her to do so within her means. The clear inference from all the evidence is that Ms. Ward was without the means to contribute to their support, another fact that the juvenile officer does not dispute.

On the subject of neglect, Ms. Ward also questions whether an "appropriate plan" was ever devised by DFS for her rehabilitation and the unification of her family. On the advice of her counsel, Ms. Ward agreed to the plan she now questions. After the termination hearing, the court made a general finding that Ms. Ward "entered into an appropriate court-approved Treatment Plan" but made no finding specifically addressing the question of the appropriateness of the plan to Ms. Ward's problems. Ample evidence demonstrated Ms. Ward's failure to comply with the court-approved plan. The difficulty is that too much evidence of her failure was adduced. The evidence strongly suggests that her inability to comply with any such plan was quite

apparent and fully known to the DFS author of the plan before it was devised. The main thrust of the juvenile officer's evidence was that Ms. Ward had long suffered from a mental condition that rendered her unable successfully to comply with the plan, the aim of which was to teach her how to control her anger and frustration and to understand and care for her children. Although the plaintiff's evidence was insufficient to support a finding that Ms. Ward suffered from a mental condition that made her unable to form an intent and to act knowingly, it was more than sufficient to show that the court-approved plan was inappropriate to Ms. Ward's known emotional instability and personality traits. Contrary to the trial court's general finding, the evidence was insufficient to establish the statutorily required appropriateness of the court-approved plan. Neither court approval of nor parental consent to a plan under § 211.447.2(2)(b) is the same as or a substitute for a finding in a later termination proceeding of the appropriateness of the plan.

■ Appropriateness of a § 211.447.2(2)(b) plan is a vital part of the essential elements of the action to terminate under subdivision (2)(b), and the court must enter a finding supported by sufficient evidence that the plan was appropriate to remedy the parent's alleged neglect of the children. In this case and in others, perhaps no appropriate treatment plan can be devised because of the characteristics of the parent, and that fact may not become apparent until one or more plans are tried. In such a case, the parent cannot be charged with neglect for failing successfully to achieve the goals of a plan that is not found to be appropriate. If the juvenile officer in such circumstances believes the parent's rights should nevertheless be terminated, the statutory scheme provides him at least eight other grounds upon which to seek termination.

### C. Failure to Rectify

■ The remaining ground of the juvenile officer's petitions and the court's order of termination was that based upon subdivision (2)(i)b of § 211.447.2. The petitions charge Ms. Ward with the failure to rectify the conditions which led to the § 211.031 removals of her children from her custody as they were born because she was unable to care for them. § 211.031.1(1)(b).

The essential elements of an action under § 211.447.2(2)(i)b are as follows: *First*, the child has come under the jurisdiction of the juvenile court under the provisions of § 211.031.1(1)(a) or (b) and an order of the court under § 211.181. *Second*, the parent has not had custody of the child for six months or longer or the child has been under the jurisdiction of the court for one year or longer. *Third*, the parent has failed to rectify the conditions which formed the basis of the child's removal from the parent's custody under § 211.031. *Fourth*, reasonable cause exists to believe that, even if given more time, the parent will not rectify those conditions on a continuing basis. *Fifth* and finally, the juvenile officer or agency has used reasonable, diligent and continuing efforts to aid the parent to rectify the conditions and provide on a continuing basis a proper home for the child.

This case is controlled by the Eastern District's holding in *In re C.P.B.*, 641 S.W.2d 456, 460–61 (Mo.App.1982). There the court held that the evidence of the mother's mental and emotional problems fell far short of the statutory grounds for termination under § 211.447.2(2)(g). The court also held, however, that the original § 211.181 order removing the children from the mother's custody was based on her "emotional instability", a condition she was not able to rectify by her own efforts. Judge Pudlowski then observed that statutes authorizing termination on account of mental illness are not intended to punish parents for conditions they cannot avoid but seek only to protect the child. Unlike neglect, abandonment, abuse, or nonsupport, the parent's mental illness is not itself harmful to the child. Therefore, he

reasoned, when the "failure to rectify" test is applied to the case of a mentally ill parent, the significant fact is not the persistence of the parent's illness but the fact of continuing or potential harm to the child. Judge Pudlowski concluded at 641 S.W.2d 460:

> The focus of the juvenile court's inquiry ... should be on the parent's ability or inability to maintain the parental relationship in a manner which would not be detrimental to the child.... [The statute] does not provide blanket authorization for termination of parental rights on account of mental illness which does not rise to the level required by subsection (g). Termination under subsection (h) [now subsection (i) ] on account of mental illness can only be ordered when it is shown by clear, cogent and convincing evidence that the child is still being harmed or is likely to be harmed in the future, if the parental relationship is continued.

The court found no evidence that the children in that case would be harmed by a continuing contact with their mother on a limited basis. But it also found that the record established that the children should not be in the permanent custody of their mother. Accordingly, in reversing the termination order of the juvenile court it directed that the children be placed in the temporary custody of their grandparents, thus avoiding the unwarranted and drastic action of final and absolute termination.

The *C.P.B.* case is indistinguishable in any significant way from Ms. Ward's case. At best, the evidence favoring termination of her parental rights is that which indicates that, particularly in their infancy, Ms. Ward was apparently unable to learn how to care for the three children or to relate to them as children. The evidence does not clearly, cogently and convincingly establish that the children are being or will be harmed if Ms. Ward's parental rights are not terminated. At the most, the evidence shows that Ms. Ward is a very difficult person to deal with because of her intractable nature. None of the evidence pertains to her ability to care for or relate to the children as they pass from infancy to childhood or to any necessity for terminating her rights to continue to be their mother and to maintain her status in a manner not detrimental to the children. Perhaps such evidence exists, but the law requires that her inability to maintain her relationship be shown by "clear, cogent and convincing evidence," which was not done here. The only specific reference in evidence to any of Ms. Ward's conduct that might be harmful to the child is the evidence that one child became ill because Ms. Ward either could not learn how to bottle-feed and care for the tiny infant or that she would not follow instructions. The children, born in 1978, 1979 and 1981, are no longer infants.

Moreover, by alleging that Ms. Ward has failed to rectify the conditions which led to the removals of the children, the juvenile officer undertook the burden of proving by clear, cogent and convincing evidence that she was able to rectify those conditions. The primary thrust of plaintiff's evidence, on the other hand, was that she suffered from a permanent and disabling emotional instability and personality disorder that she would be unable to rectify. As the court in *In re C.P.B.* indicated, the legislature did not intend to authorize termination actions as a punishment of parents for conditions they cannot remedy because of disabilities arising out of emotional and personality disorders. On this evidence, to sustain the termination of Ms. Ward's parental rights upon the ground of failure to rectify would be to do just that.

Accordingly, we must reverse the order of the trial court. But as we said in *In re R.S.P.*, 619 S.W.2d 863, 865 (Mo.App.1981), reversal here does not mean that the juvenile court has lost its jurisdiction over these three children. That jurisdiction continues under the orders originally entered with respect to each child in the § 211.031 proceedings.

For the foregoing reasons, we reverse the judgment.

All concur.